## STOCKLEY et al. v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit.    March 24, 1921.)

No. 3521.

1. **Public lands ☞29—Executive can withdraw land from entry without special authority from Congress.**

The executive has the right to withdraw lands from entry, settlement, or other form of appropriation without special authority from Congress.

2. **Public lands ☞96—President may act through Secretary of Interior in withdrawing land from entry.**

Action by the Secretary of the Interior is a proper method of exercising the power of the President to withdraw public lands from entry, and is to be taken as the act of the President.

3. **Public lands ☞98—Approval and certificate essential to final entry, which starts limitations.**

There is no final entry of public lands, within Act March 3, 1891, making the right of the entrymen to such lands absolute when two years have elapsed since final entry without any contest or protest, until the entry has been approved by the register and his final certificate issued; it being insufficient that the fees therefor were received and a receipt given for them, subject to further determination of the rights of the entrymen.

4. **Public lands ☞98—Final entry held not to have been made two years before rejection of application.**

Under Rev. St. § 2302 (Comp. St. § 4591), providing that mineral lands are not subject to entry as a homestead whenever that fact becomes known, a homestead on lands which had been withdrawn from entry as oil lands subsequent to settlement, but before entry, so that the authority of the receiver to accept final entry had been withdrawn, was not finally entered by payment and receipt of the fees, subject to future determination of the applicant's rights, at least before the receiver accepted the entry and issued his certificate, so that the entry could be attacked by the United States within two years after the certificate was issued, though that was more than two years after the entry was filed and the fees paid.

5. **Public lands ☞29—Oil withdrawal held not to except unentered homestead.**

A withdrawal of oil lands from entry, "subject to existing valid claims," withdraws from homestead entry a tract on which a settlement had been made in good faith, but which had not then been finally entered, and which in fact was subsequently found to contain oil.

6. **Public lands ☞96—Appeal unnecessary to supervision by Commissioner or Secretary.**

The power of the Secretary of the Interior and the Commissioner of the General Land Office to supervise the disposal of the public lands, under Rev. St. §§ 441, 453, 456 (Comp. St. §§ 681, 699, 703), can be exercised by them, though no appeal was taken from the decision of the register approving the final entry.

7. **Public lands ☞108—Finding of Secretary, supported by evidence, is binding on courts.**

Unless there is an absence of evidence to support them, the findings of fact of the Secretary of the Interior in a matter properly before him are binding on courts.

8. **Appeal and error ☞1022(2)—Findings of master, approved by court, almost controlling, if substantially supported.**

Findings of fact by the master, approved by the trial court, are well-nigh controlling on appeal, if there is any substantial evidence to support them.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Western District of Louisiana; Rufus E. Foster, Judge.

Suit by the United States against Thomas J. Stockley and others. Decree for complainant, and defendants appeal. Affirmed.

J. A. Thigpen and S. L. Harold, both of Shreveport, La., for appellants.

Robert A. Hunter, Sp. Asst. Atty. Gen., for appellee.

Before WALKER, BRYAN, and KING, Circuit Judges.

KING, Circuit Judge. On August 2, 1917, the United States filed a bill in equity in the United States District Court for the Western District of Louisiana, at Shreveport, against Thomas J. Stockley, and certain persons claiming under an oil lease executed by him, seeking a decree declaring the United States to be the owner of lot 5 of section 5 in township 20 N., range 16 W., situated in the parish of Caddo, La., containing 29.87 acres, as per plat of survey approved March 28, 1917, by Clay Tallman, Commissioner of the General Land Office, and ex officio Surveyor General for the state of Louisiana, for an accounting for the oil and gas taken from said lot, and for injunction.

The defendants denied the title of the government, and asserted that the land was a homestead owned by said Stockley; that he had made entry on November 13, 1905, and on January 5, 1909, final proof, and had received the receiver's receipt upon final entry on January 16, 1909; that more than two years had elapsed since said final entry, without any contest or protest being initiated, wherefore under the act of Congress approved March 3, 1891 (26 Stat. 1095, c. 561), he had become the absolute owner and entitled to patent thereto; that on March 17, 1910, he had executed a mineral lease to the Gulf Refining Company of Louisiana. The defendants admitted the production of oil from said lands by the Gulf Refining Company, and the amount thereof, and the payment of royalties to Stockley, to W. H. Henderson, Jr., a transferee of Stockley, and to Natalie Oil Company, another transferee of Stockley.

The facts showed: That in 1897 Stockley settled on said land. That on November 13, 1905, he filed his first homestead entry. He lived on said land until a few months before making his final entry. He built a two-room house thereon and cultivated a part of the land. On December 15, 1908, this land, with others, was, "subject to existing valid claims, withdrawn from settlement and entry, or other form of appropriation," by executive order. On the same day, referring to this order, the local register and receiver were instructed by the General Land Office that no rights could be obtained by any proceeding or claim initiated thereafter and that they must reject all such applications, selections, or entries, subject to appeal. That all such applications, selections, entries, and proofs based upon selections, settlements, or rights made prior to the date of withdrawal—

"may be received by you and allowed to proceed under the rules up to and including the submission of final proofs. You must not, however, in such cases receive the purchase money or issue final certificates of entry, but

must suspend the entries and proofs pending investigation as to the validity of the claims with regard to the character of the land and compliance with the law in other respects. You will place such suspended cases in a file in your office, and for the information of this office prepare and forward a schedule thereof with your monthly returns. * * *"

On January 16, 1909, Stockley filed the nonmineral affidavit prescribed to be made for final entry, in which among other things he swore:

"That the land is essentially nonmineral land; that this application therefor is not made for the purpose of fraudulently obtaining title to mineral land, but with the object of securing said land for agricultural purposes."

At the time of filing this affidavit he paid to the receiver of public moneys the sum of $3.01 and received a receipt reciting its payment—

"in connection with Hd. Final, Serial No. 1088, for [describing land] 71.25 acres at 1.25 per acre, $———.

| Fees | |
|---|---|
| Commissions | $1.76 |
| Testimony fees, etc. | 1.25 |
| | $3.01 |
| Less com's suspended in unofficial mys. (moneys) | 1.76 |
| | $1.25 |

"C. J. Greene, Receiver of Public Moneys."

No certificate of the register accepting the final proofs was made. On February 27, 1912, a contest of Stockley's entry was ordered by the Commissioner of the General Land Office on the ground that the land was mineral, being chiefly valuable for oil and gas, and that Stockley knew facts sufficient to charge him, as an ordinarily prudent man, with notice that the tract contained deposits of oil and gas and was chiefly valuable therefor. On such hearing the register and receiver recommended that the patent issue, but the Commissioner reversed this holding, and on Stockley's appeal the Secretary of the Interior sustained the Commissioner's ruling.

The lapse of two years from the date of Greene's receipt was urged as preventing the denial of the patent. But the Secretary ruled that under the withdrawal order of December 15, 1908, and the instructions forbidding the receiver to receive a final payment, and in the absence of a certificate from the register, there had been no final entry, nor payment on final entry, so as to bring this case within the operation of the Act of March 3, 1891.

The Secretary, however, found that the entry of Stockley had been made in 1905 in good faith, and therefore ordered that he be issued a surface patent under the provisions of the Act of July 17, 1914 (Comp. St. §§ 4640a–4640c), reserving all minerals to the United States. Stockley declined the surface patent. The District Court overruled the plea that the United States was barred by the two-year limitation of the Act of March 3, 1891 (26 Stat. 1095–1099).

The case was referred to a master, who found the facts in favor of the contention of the United States and recommended a decree adjudging the title to the lands in them, and also finding mesne profits against the defendants respectively in certain sums. The court has so decreed.

The defendants appeal, insisting: (1) That under the Act of March 3, 1891, Stockley is entitled to a patent and consequently has complete equitable title to the property. (2) That his homestead entry was never affected by the order of withdrawal. (3) That the orders of the Secretary of the Interior and Commissioner of the General Land Office were illegal, null, and void, the decision of the legal register and local receiver not having been appealed from. (4) That said decisions are null and void because the land in question was not mineral at the time of final entry, and that there was no evidence so showing.

[1] 1. The rights of the Executive to withdraw lands from entry, settlement, or other forms of appropriation, without special authority from the Congress, is no longer open to question. Sustaining the power of the Executive, the Supreme Court of the United States has said:

"The Executive, as agent, was in charge of the public domain. By a multitude of orders, extending over a long period of time and affecting vast bodies of land, in many states and territories, he withdrew large areas in the public interest. These orders were known to Congress, as principal, and in not a single instance was the act of the agent disapproved. Its acquiescence all the more readily operated as an implied grant of power, in view of the fact that its exercise was not only useful to the public, but did not interfere with any vested right of the citizen." United States v. Midwest Oil Co., 236 U. S. 459, 475, 35 Sup. Ct. 309, 314 (59 L. Ed. 673.)

[2] The action of the Secretary of the Interior is a proper method of exercising the power of the President, and is to be taken as his act. United States v. Morrison, 240 U. S. 192, 36 Sup. Ct. 326, 60 L. Ed. 599.

[3] 2. We do not think that this case falls under Act of March 3, 1891, or that there had ever been issued a receipt of the receiver on final entry. According to the testimony in this case, to constitute a final entry, the papers are submitted to the local register and local receiver. If approved by them, the register issues a certificate and the papers are sent to the General Land Office.

That the final entry is not made until the certificate of the register is issued is apparent from the ruling of the Interior Department:

"The proviso has reference solely to entries upon which final certificate has issued. Hence, any action that was taken with reference to this entry prior to the issuance of the final certificate cannot be considered as affecting the question whether the entry was or was not confirmed, as the action contemplated by the statute must be taken with reference to the final entry. No case is brought within the terms of the act until after the final certificate has been issued. That fixes the period within which action must be taken to defeat confirmation under the proviso." Ira M. Bond, 15 Land Dec. 228.

"The language of the statute is, 'After the lapse of two years from the date of the issuance of the receiver's receipt upon the final entry,' and when there shall be no pending contest or protest against the validity of 'such entry' the entryman shall be entitled to a patent. This case was not brought within the terms of the act until the issuance of the final certificate March 6, 1893. To defeat the confirmation it was necessary that some action should have been taken against that entry, within two years from that date." Azariah W. Colburn et al., 29 Land Decisions, 539.

"It is too much to say that the mere offering of final proof by an entryman, together with the final commissions or the price of the land, constitutes a final entry. As stated, final entry presupposes an adjudication and acceptance by the register of the proof submitted, and the final certificate thereupon

issued constitutes a formal declaration that the claimant is entitled to patent. It cannot be contended that the proviso to the act of 1891 relieved the register of his adjudicating power, and final entry is in no case allowed by him until and unless from the showing submitted he is satisfied that the law has been complied with." Veatch Case (decision rendered November 26, 1918) 46 Land Dec. 496.

This is in harmony with the practice recognized by the United States Supreme Court in Orchard v. Alexander, 157 U. S. 372, 383, 15 Sup. Ct. 635, 639 (39 L. Ed. 737):

"Again, one of the instructions issued by the Land Department to the registers and receivers, and which has been in force for half a century, is this: 'Final proof in preemption cases must be made to the satisfaction of the register and receiver, whose decision, as in other cases, is subject to * * * review by this office.' "

That the mere receipt of the money by the receiver, until the papers are accepted as a final entry by the register and receiver and the register's certificate issued, is not a "receipt on final entry," is made manifest by the instructions of the Commissioner of the General Land Office issued June 1, 1908, as follows:

"28. The issuance of a receipt by a receiver of public moneys does not mean that the application, entry, proof, etc., in connection with which it is issued, is allowed or approved, or will be allowed or approved. It merely means that he has received the money and that it is in his custody until it is applied or returned.

"29. If, after a receipt has been issued, the application, entry, proof, etc., with which the money was tendered cannot be allowed or approved, or the transcripts of records, plats, etc., cannot be made, you will notify the party to whom the receipt issued, and, with this notification, the money tendered must be returned in the following way: * * *

"31. If, after a receipt has issued, the application, entry, proof, etc., can be allowed or approved, no further receipt for the money paid in connection therewith will be issued; but notice of such allowance or approval will be given the person to whom the receipt issued. Such notations as "Application not yet allowed," or "Certificate not yet issued," are not necessary on the receipts nor the abstracts."

It is evident, therefore, that this case is wholly unlike that of Lane v. Hoglund, 244 U. S. 174, 37 Sup. Ct. 558, 61 L. Ed. 1066. In that case the land was fully open to entry, although covered with forest, at the time when entered. The case of one in Hoglund's condition was expressly excepted by the withdrawal order. It expressly excepted any land—

"embraced in any legal entry or covered by any lawful filing duly of record in the proper United States land office, or upon which any valid settlement has been made pursuant to law, and the statutory period within which to make the filing of record has not expired."

Hoglund had complied with every requirement of the law, and had secured the approval of his papers from the local officers, a receipt from the receiver, and a certificate from the register; the certificate stating that on presentation thereof to the General Land Office he was entitled to a patent for the land mentioned therein. Here a nonmineral affidavit was made, which was essential to the making of a final entry, and it

has been ruled that the facts within Stockley's knowledge at the time charged him with notice that it was not true.

[4] In this case, these lands, being mineral, were not subject to being entered as a homestead whenever that fact became known. Rev. Stat. § 2302 (Comp. St. § 4591). Prior to the presentation of any final entry they had been withdrawn from entry. The right of the receiver to accept any money from an entryman had been withdrawn by the letter of December 15, 1908. Payment of the moneys due was made to an officer then forbidden to take it.

No approval of the local officers was ever made until March 1, 1913, when the local register and receiver rendered a decision in favor of Stockley. On review by the Commissioner he reversed this finding in December, 1913, and ordered the homestead entry held for cancellation, subject to appeal to the Secretary. Such appeal was taken, and the Secretary affirmed the Commissioner's finding, holding that the effect of the order of the department, made on December 15, 1908—

"was to suspend this and other entries in like situation, and the receipt issued by the receiver in this case was merely an evidence of the payment of fees and commissions, and did not and could not relieve the entry from the suspension created by said order of December 15, 1908."

The Secretary further found:

"The investigation made and the evidence submitted convince the department that the lands are, and were at date of final proof, valuable for their deposits of oil and gas, and that consequently this department is, under the circumstances, without authority to issue final certificate and patent for said land, including the said mineral deposits. If patent be issued to the entryman, it must be under the provision of the act of July 17, 1914, supra, reserving to the United States the deposits of oil and gas in the land. The decision of the Commissioner, finding the lands to be mineral in character, is therefore affirmed; but under the circumstances the department finds no evidence of bad faith existent at the time of the original entry in 1906, and is of the opinion that the entryman may be given a limited patent under the Act of July 17, 1914. As thus modified, the Commissioner's decision is affirmed, and, should this decision become final, the entryman will be permitted to take patent under the provisions of said Act of July 17, 1914."

It thus appears that in this case no payment on final entry was made to the receiver, that no final entry was made until March 1, 1913, and that therefore the Act of March 3, 1891, did not, if applicable, prevent the rejection of the application. Further, what was really decided by the Secretary was that the entryman was entitled to receive a patent restricted to the surface of the land, reserving the minerals to the United States. This vested in him all agricultural rights—that for which he said he was entering the land.

[5] 3. It is insisted that Stockley's right to his homestead is excepted from this order of withdrawal of December 15, 1908, by its terms, whereby the withdrawal is made "subject to existing valid claims." But at the time of this withdrawal Stockley had not presented any claim for final entry. The withdrawal order was based on the belief that these lands contained oil and were not agricultural. Until the issuance of a patent the United States has the right to ascertain if the

lands are in fact mineral or not. Orchard v. Alexander, 157 U. S. 372, 15 Sup. Ct. 635, 39 L. Ed. 737; Parsons v. Venzke, 164 U. S. 89, 17 Sup. Ct. 27, 41 L. Ed. 360.

"In other words, the power of the department to inquire into the extent and validity of the rights claimed against the government does not cease until the legal title has passed." Michigan Land & Lumber Co. v. Rust, 168 U. S. 589, 593, 18 Sup. Ct. 208, 209 (42 L. Ed. 591).

The cases relied on by the appellants are cases of conflicting rights between an entryman and third parties, and are not in point in defining the relative rights of an entryman before final entry as against the government. This is clearly shown by the decisions. In the Yosemite Valley Case, where one had purchased the improvements of an older settler and taken possession, prior to the passage of the act of Congress granting the valley as a park to the state of California, with the intention to take up a homestead, it was held:

"The simple question presented for determination is whether a party, by mere settlement upon lands of the United States, with a declared intention to obtain a title to the same under the pre-emption laws, does thereby acquire such a vested interest in the premises as to deprive Congress of the power to divest it by a grant to another party. * * * The question here presented was before this court, and was carefully considered, in the case of Frisbie v. Whitney, reported in 9 Wallace, and it was there held that under the pre-emption laws mere occupation and improvement of any portion of the public lands of the United States, with a view to pre-emption, do not confer upon the settler any right in the land occupied, *as against the United States*, or impair in any respect the power of Congress to dispose of the land in any way it may deem proper; and that the power of regulation and disposition, conferred upon Congress by the Constitution, only ceases when all the preliminary acts prescribed by those laws for the acquisition of the title, including the payment of the price of the land, have been performed by the settler. When these prerequisites have been complied with, the settler for the first time acquires a vested interest in the premises occupied by him, of which he cannot be subsequently deprived. He is then entitled to a certificate of entry from the local land officers, and ultimately to a patent * * * from the United States. Until such payment and entry the acts of Congress give to the settler only a privilege of pre-emption in case the lands are offered for sale in the usual manner; that is, the privilege to purchase them in that event in preference to others. The United States by those acts enter into no contract with the settler, and incur no obligation to any one that the land occupied by him shall ever be put up for sale. They simply declare that in case any of their lands are thrown open for sale the privilege to purchase them in limited quantities, at fixed prices, shall be first given to parties who have settled upon and improved them. The legislation thus adopted for the benefit of settlers was not intended to deprive Congress of the power to make any other disposition of the lands before they are offered for sale, or to appropriate them to any public use. * * * The whole difficulty in the argument of the defendant's counsel arises from his confounding the distinction made in all the cases, whenever necessary for their decision, between the acquisition by the settler of *a legal right to the land* occupied by him as against the owner, the United States, and the acquisition by him of a *legal right as against other parties to be preferred in its purchase*, when the United States have determined to sell." The Yosemite Valley Case, 15 Wall. 77, 86, 87 (21 L. Ed. 82).

These cases are cited with approval in the case of Shiver v. United States, 159 U. S. 491, 496, 16 Sup. Ct. 54, 56 (40 L. Ed. 231), where it is also said:

"The right which is given to a person or corporation, by a reservation of public lands in his favor, is intended to protect him against the actions of third parties, as to whom his right to the same may be absolute. But, as to the government, his right is only conditional and inchoate."

Here the entryman was applying for an agricultural homestead. The statutes regulating such homesteads expressly provided:

"Nor shall mineral lands be liable to entry and settlement under this provision." Rev. St. § 2302 (Comp. St. § 4591).

He applied, after withdrawal, for final entry, filing the required nonmineral affidavit, which was, as held by the Land Department and found as a fact, untrue. He cannot be considered as one having a legal valid claim to this homestead against the United States.

[6] 4. That no appeal was taken from the finding of March 1, 1913, made by the register and receiver, does not deprive the General Land Commissioner and the Secretary of the Interior of jurisdiction to review the same. Supervision of the action of the local register and receiver in accepting or rejecting final entries of homesteads is vested in the Commissioner of the General Land Office and the Secretary of the Interior, who can review and reverse the action of such registers and receivers. Revised Statutes, §§ 441, 453, and 456 (Comp. St. §§ 681, 699, 703), provide:

"Sec. 441. The Secretary of the Interior is charged with the supervision of public business relating to the following subjects: * * * Second. The public lands, including mines. * * *"

"Sec. 453. The Commissioner of the General Land Office shall perform, under the direction of the Secretary of the Interior, all executive duties appertaining to the surveying and sale of the public lands of the United States, or in any wise respecting such public lands, and, also, such as relate to private claims of lands, and the issuing of patents for all grants of land under the authority of the government."

"Sec. 456. All returns relative to the public lands shall be made to the Commissioner of the General Land Office."

The Supreme Court of the United States has affirmed the power to exercise this supervision, in the absence of an appeal:

"The phrase 'under the direction of the Secretary of the Interior,' as used in these sections of the statutes, is not meaningless, but was intended as an expression in general terms of the power of the Secretary to supervise and control the extensive operations of the land department of which he is the head. * * * As was said by the Secretary of the Interior on the application for the recall and cancellation of the patent in this Pueblo Case (5 Land Dec. 494): 'The statutes in placing the whole business of the department under the supervision of the Secretary, invest him with authority to review, reverse, amend, annul or affirm all proceedings in the department having for their ultimate object to secure the alienation of any portion of the public lands, or the adjustment of private claims to lands, with a just regard to the rights of the public and of private parties. Such supervision may be exercised by direct orders or by review on appeals. The mode in which the supervision shall be exercised in the absence of statutory direction may be prescribed by such rules and regulations as the Secretary may adopt. When proceedings affecting titles to lands are before the department the power of supervision may be exercised by the Secretary, whether these proceedings are called to his attention by formal notice or by appeal. It is sufficient that they are brought to his notice. The rules prescribed are designated to facilitate the department in the despatch of business, not to defeat the

supervision of the Secretary. For example, if, when a patent is about to issue, the Secretary should discover a fatal defect in the proceedings, or that by reason of some newly ascertained fact the patent, if issued, would have to be annulled, and that it would be his duty to ask the Attorney General to institute proceedings for its annulment, it would hardly be seriously contended that the Secretary might not interfere and prevent the execution of the patent. He could not be obliged to sit quietly and allow a proceeding to be consummated, which it would be immediately his duty to ask the Attorney General to take measures to annul. It would not be a sufficient answer against the exercise of his power that no appeal had been taken to him and therefore he was without authority in the matter." Knight v. United States Land Association, 142 U. S. 161, 177, 178, 12 Sup. Ct. 258, 262 (35 L. Ed. 974).

See, also, Orchard v. Alexander, 157 U. S. 372, 15 Sup. Ct. 635, 39 L. Ed. 737; Plested v. Abbey, 228 U. S. 42, 33 Sup. Ct. 503, 57 L. Ed. 724; Hawley v. Diller, 178 U. S. 481, 488, 20 Sup. Ct. 986, 44 L. Ed. 1157; Kirk v. Olson, 245 U. S. 225, 228, 38 Sup. Ct. 114, 62 L. Ed. 256.

5. The findings of the General Land Commissioner and the Secretary of the Interior are not without evidence to support them and are valid. Here the General Land Commissioner and the Secretary of the Interior, on appeal, after hearing from the entryman, found as facts that at the date of application for final entry the land was mineral in character and that the applicant when making his nonmineral affidavit had knowledge of facts, which put a man of ordinary intelligence on notice that it was mineral. It is conceded that, not long after making such affidavit, he leased the land to an oil company, for the purpose of its raising oil, reserving royalties.

[7] Unless there is an absence of evidence to support them, the findings of fact of the Secretary of the Interior, in a matter properly before him, are binding on the courts. Johnson v. Riddle, 240 U. S. 467, 36 Sup. Ct. 393, 60 L. Ed. 752. The master has found on the facts that the land was mineral in character and that the entryman was charged with notice of its character at the time he made his application for final entry and his non-mineral affidavit. The trial court has approved these findings of fact.

[8] It cannot be said that there is a want of evidence upon which to base them. The findings of fact of the master approved by the trial court are well-nigh controlling on appeal, if there is any substantial evidence to support them. Osley et al. v. Adams (C. C. A.) 268 Fed. 114, 117; In re Schwab-Kepner Co., 203 Fed. 475, 121 C. C. A. 597; Greey v. Dockendorff, 231 U. S. 513, 34 Sup. Ct. 166, 58 L. Ed. 339.

The decree of the District Court is affirmed.