WOOD ET AL. *v.* LOVETT.

No. 709.   Submitted April 2, 1941.—Decided May 26, 1941.

*Mr. J. G. Burke* submitted for appellants.

*Mr. Walter G. Riddick* submitted for appellee.

364

Mr. Justice Roberts delivered the opinion of the Court.

This appeal presents the question whether an Arkansas Act of March 17, 1937, as construed and applied, violates Article I, § 10, of the Constitution.

March 20, 1935, an act of the legislature of Arkansas[1] took effect which provided:

"Whenever the State and County Taxes have not been paid upon any real or personal property within the time provided by law, and publication of the notice of the sale has been given under a valid and proper description, as provided by law, the sale of any real or personal property for the non-payment of said taxes shall not hereafter be set aside by any proceedings at law or in equity because of any irregularity, informality or omission by any officer in the assessment of said property, the levying of said taxes, the making of the assessor's or tax book,

[1] Act 142 of 1935.

the making or filing of the delinquent list, the recording thereof, or the recording of the list and notice of sale, or the certificate as to the publication of said notice of sale; provided, that this Act shall not apply to any suit now pending seeking to set aside any such sale, or to any suit brought within six months from the effective date of this Act for the purpose of setting aside any such sale."

Certain land in Desha County, Arkansas, was sold to the State in 1933 for non-payment of 1932 taxes. The land was not redeemed and was certified to the State, as owner. In 1936 the Commissioner of State Lands, on behalf of the State, by deeds reciting his statutory authority so to do, conveyed to the appellants all the right, title, and interest of the State in two parcels of the land.

By an Act of March 17, 1937, the Act of March 20, 1935, was repealed.[2]

January 10, 1939, the corporation which owned the land when sold for non-payment of taxes conveyed to the appellee, and, on January 21, he brought suit against the appellants to cancel the State's deeds, to quiet his title, and for mesne profits or rents. He alleged that there were irregularities in the proceedings prior to the sale to the State which rendered it void. The appellants admitted the irregularities. It was agreed on all hands that though these irregularities would have constituted grounds for avoiding the sale but for the provisions of the Act of 1935, they would not have been available to the appellee if the Act were still in force. The trial court entered a decree in favor of the appellee which the Supreme Court affirmed.[3]

The appellants contended in the courts below, and con-

---

[2] Act 264 of 1937.

The words of the Act are: "That Act 142 of the Acts of 1935 be and the same is hereby repealed."

[3] 201 Ark. 129; 143 S. W. 2d 880.

tend here, that if the Act of 1937 be given the effect of divesting them of title confirmed in them by the Act of 1935 the later Act impairs the obligation of their contracts with the State. The Supreme Court of Arkansas held that "the Act [of 1935] does not profess to cure tax sales, but only [provides] that tax sales shall not be set aside by the courts because of certain irregularities and informalities, naming them." It said that the appellants acquired no greater vested interest or title than the State had and the repeal of the Act of 1935 "violated no constitutional right of theirs to a defense" thereunder. We are of opinion that the decision was erroneous.

For present purposes it is unnecessary to recite the statutory procedure for assessment, levy, and collection of real estate taxes in Arkansas. If the taxes levied become delinquent, a sale by the Collector is authorized. If no person bids the amount of the delinquent taxes, penalty, and costs, the Collector is to bid in the property in the name of the State.[4] The State is not required to pay the amount bid in its name.[5] The Clerk of the County Court is required to make a record of the sale to the State and send a certificate thereof to the Auditor of State.[6] Lands thus sold to the State may be redeemed within two years of the sale.[7] After expiration of the period of redemption, the County Clerk executes a certificate of sale and causes the same to be recorded in the County Recorder's office. Thereupon the lands vest in the State. The certificate, after recordation, is sent by the Clerk to the Commissioner of State Lands and thereupon the lands are subject to disposal according to law.[8]

---

[4] Pope's Digest 1937, § 13849.

[5] Id., § 13853.

[6] Id., § 13855.

[7] Id., § 13868.

[8] Id., § 13876.

The Commissioner is authorized to sell them and to make deeds to purchasers.[9]

As the Supreme Court has indicated in this case, Act 142 of 1935 was one of a series of statutes adopted to prevent the setting aside of tax sales and titles based upon them, for informalities and irregularities in the assessment and levy of taxes and the sale of property for delinquent taxes, which had seriously impeded the effective collection of taxes and diminished the State's revenue.

In *Berry* v. *Davidson*, 199 Ark. 276, 280; 133 S. W. 2d 442, the court, after referring to several similar acts, said:

". . . we now think it apparent that the legislature was endeavoring to find and put into effect a remedy or means to correct the evils growing out of nonpayment of taxes, to prevent tax evasion. For many years it was a recognized proposition that tax forfeitures and sales of land on account thereof were well nigh universally held ineffectual to convey title, and there is perhaps at this time, no doubt, that there was a general recognition of the futility of taxing laws; that it was thought by many that people need not pay taxes if they were willing to meet the worry and expenses of litigation in regard thereto."

. . . . .

"Act 142, above mentioned, while it was still in force, was another evidence of the legislature's effort and struggle to correct or cure these well grounded and long established practices illustrating the futility of the law requiring payment of taxes. Out of all this has come Act 119 of the Acts of 1935 construed and upheld in the last cited case. [*Fuller* v. *Wilkinson*, 198 Ark. 102, 128 S. W. 2d 251.] According to the terms of that statute, when it shall have been invoked in regard to such tax sales, we must, and do, hold that the decree of confirmation of a sale to the state 'operates as a complete bar against any and all persons,

[9] *Id.*, §§ 8610, 8620.

firms, corporations, quasi-corporations, associations who may claim said property' sold for taxes subject only to the exceptions set forth and stated in the act, none of which is applicable to aid the appellant."

It is evident from these statements that the purpose of Act 142 was definitely to assure purchasers from the State that the land bought by them could not be taken away from them on grounds theretofore available to the delinquent taxpayer.

In its opinion in the present case, the court lays stress on the fact that Act 142 was not a curative act, although in earlier decisions it had repeatedly so designated it.[10] But we do not deem the name or label of the legislation important. The fact is, as the court below holds, that the purpose and effect of the statute were to render unavailing to the owner whose property had been sold for taxes, as grounds of attack on the title of the purchaser from the State, irregularities and informalities in the performance of acts by state officers in connection with the assessment, levy, and sale which the legislature could, in its discretion, have omitted to prescribe as essentials to the passing of a valid title.

The Act of 1935 must be viewed in the setting of the statutory scheme of taxation, sale of forfeited lands to the State, and sale in turn by the State. Its purpose was to assure one willing to purchase from the State a title immune from attack on grounds theretofore available. By its legislation the State said, in effect, to the pro-

---

[10] *Carle* v. *Gehl*, 193 Ark. 1061; 104 S. W. 2d 445; *Deaner* v. *Gwaltney*, 194 Ark. 332; 108 S. W. 2d 600; *Lambert* v. *Reeves*, 194 Ark. 1109; 110 S. W. 2d 503; 112 S. W. 2d 33; *Gilley* v. *Southern Corporation*, 194 Ark. 1134; 110 S. W. 2d 509; *Foster* v. *Reynolds*, 195 Ark. 5; 110 S. W. 2d 689; *Wallace* v. *Todd*, 195 Ark. 134; 111 S. W. 2d 472; *Burbridge* v. *Crawford*, 195 Ark. 191; 112 S. W. 2d 423; *Kansas City Life Ins. Co.* v. *Moss*, 196 Ark. 553; 118 S. W. 2d 873; *Sanderson* v. *Walls*, 200 Ark. 534; 140 S. W. 2d 117.

spective purchaser of lands acquired for delinquent taxes, that if he would purchase he should have the immunity. Under the settled rule of decision in this court, the execution of the State's deeds to the appellants constituted the execution or consummation of a contract, the rights arising from which are protected from impairment by Article I, § 10 of the Constitution; and the obligation of the State arising out of such a grant is as much protected by Article I, § 10, as that of an agreement by an individual. *Fletcher* v. *Peck,* 6 Cranch 87, 136, 137, 139. The Act of 1935, taken in connection with the other statutes regulating the acquirement by the State, and the disposition by it, of lands sold for delinquent taxes, constituted, in effect, an offer by the State to those who might become purchasers of such lands, and the protection it afforded to the title acquired by such purchasers necessarily inured to every purchaser acting under it and constituted a contract with him.[11]

The federal and state courts have held, with practical unanimity, that any substantial alteration by subsequent legislation of the rights of a purchaser at tax sale, accruing to him under laws in force at the time of his purchase, is void as impairing the obligation of contract.[12]

---

[11] *Woodruff* v. *Trapnall,* 10 How. 190, 205.

[12] *Corbin* v. *Commissioners,* 3 F. 356; *Marx* v. *Hanthorn,* 30 F. 579 (see 148 U. S. 172, 182); *Tracy* v. *Reed,* 38 F. 69; *Walker* v. *Ferguson,* 176 Ark. 625, 3 S. W. 2d 694; *Chapman* v. *Jocelyn,* 182 Cal. 294, 187 P. 962; *Hull* v. *Florida,* 29 Fla. 79, 11 So. 97; *State Adjustment Co.* v. *Winslow,* 114 Fla. 609, 154 So. 325; *Morris* v. *Interstate Bond Co.,* 180 Ga. 689, 180 S. E. 819; *Bruce* v. *Schuyler,* 9 Ill. 221; *Solis* v. *Williams,* 205 Mass. 350, 91 N. E. 148; *Curry* v. *Backus,* 156 Mich. 342, 120 N. W. 796; *Rott* v. *Steffens,* 229 Mich. 241, 201 N. W. 227; *State* v. *McDonald,* 26 Minn. 145, 1 N. W. 832; *Blakeley* v. *L. M. Mann Land Co.,* 153 Minn. 415, 190 N. W. 797; *Price* v. *Harley,* 142 Miss. 584, 107 So. 673; *State* v. *Osten,* 91 Mont. 76, 5 P. 2d 562; *Pace* v. *Wight,* 25 N. M. 276, 181 P. 430; *Dikeman* v. *Dikeman,* 11 Paige (N. Y.) 484; *State* v. *Stephens,* 182 Wash. 444,

Appellee relies upon the circumstance that the State's deed is a quitclaim. From this it is inferred that no contract was made that the terms of the Act of 1935 were to bind the State with respect to the title conveyed. But "the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." [13] This court has held that the terms of a statute according rights and immunities to a vendee of the State are a part of the obligation of the deed made pursuant to it. The grant of the State of Georgia involved in *Fletcher* v. *Peck, supra,* was a patent of the public lands of the State and, of course, contained no warranty of title save such as is implied from the fact that the State purports to grant its own lands. In *Pennoyer* v. *McConnaughy,* 140 U. S. 1, the rights of the plaintiff held to be protected by Art. 1, § 10, arose out of his application for a patent filed pursuant to a state statute. The impairment was worked out by a subsequent statute seeking to destroy the right of the plaintiff to the patent pursuant to his compliance with the earlier act. No warranty was involved. In *Appleby* v. *New York City,* 271 U. S. 364, it appeared that the legislature had fixed the shore line of the City of New York along the Hudson River and that the land inside that line had been granted to the city with the consequent right to convey it. The city had conveyed land under water, on the landward side of the line, to Appleby by a quitclaim deed.[14] By subsequent

---

47 P. 2d 837; *Milkint* v. *McNeeley,* 113 W. Va. 804; 169 S. E. 790; *State* v. *Gether Co.,* 203 Wis. 311, 234 N. W. 331. Compare *McNee* v. *Wall,* 4 F. Supp. 496; *Moore* v. *Branch,* 5 F. Supp. 1011.

[13] *Home Building & L. Assn.* v. *Blaisdell,* 290 U. S. 398, 429.

[14] The phraseology of the deed is: "And it is hereby further agreed by and between the parties to these presents, and the true intent and meaning hereof, is that this present grant and every word or thing in the same contained shall not be construed or taken to be a covenant

statutes the State granted the city authority to use the land in question for municipal purposes and the city proceeded to improve it. This court held that the city's grant, made with full legislative sanction, could not be impaired by the subsequent legislation.

As in the cases cited, so here, the question is whether the State granted a valuable right which it subsequently essayed to take away. The Supreme Court of Arkansas sustained the constitutional validity of Act 142 of 1935 on the obvious ground that a taxpayer has no vested right in any given form of procedure for forfeiture of lands for non-payment of taxes. As that court has held, the extent of his right is that he shall have notice of the sale and a fair opportunity to prevent forfeiture for default. It is suggested that the act of the State in depriving the tax-payer of the right to set aside a sale for technical procedural defects is of like quality with the State's attempt to restore the taxpayer's rights against the appellants who purchased from the State. But obviously the two acts are not of the same quality. The taxpayer had neither a contract nor any other constitutional right as against the State to insist upon any given form of procedure, so long as what was done in forfeiting his lands was not arbitrary or unfair. But the appellants, as purchasers from the State, were given, by the Act of 1935, an important assurance that the State would not itself take away or authorize others to destroy the estate which it had granted, by reason of technical defects in procedure cured by the Act of 1935.

The appellee suggests that it is significant that the State was not a party to this suit, and was not, therefore, seeking to take back what it had granted. But, as *Fletcher* v. *Peck,*

---

or covenants of warranty or of seizin, of said parties of the first part or their successors or to operate further than to pass the estate right, title or interest they may have or may lawfully claim in the premises hereby conveyed by virtue of their several charters and the various acts of the Legislature of the People of the State of New York."

*supra,* shows, this is not important; for that suit was between two private parties, as is this, one claiming rights conferred by the earlier state action and the other claiming superseding rights under later legislation.

It begs the question to say that the State may not abdicate its police power. In the exercise of the policy committed to the legislature it is competent for the State to enter into a contract which it intends as an assurance of protection to its grantee.[15] This we think the State has plainly done in the present instance. The judgment is

*Reversed.*

MR. JUSTICE BLACK, dissenting:

There is far more involved here than a mere litigation between rival claimants to a few hundred acres of Arkansas land. In my view, the statute here stricken down is but one of many acts adopted both by Congress and by state legislatures in an effort to meet the baffling economic and sociological problems growing out of a nationwide depression. These problems—among them the owners' loss of homes and farms, chiefly through mortgage sales and tax forfeitures and the states' concomitant loss of tax revenues—challenged the wisdom and capacity of the nation's legislators.

Among the efforts of Arkansas' legislators to meet these problems was the legislation adopted by Act 142 of 1935 and repealed by Act 264 of 1937—the repealing act being the statute here held invalid. It is quite apparent that considerations of public policy induced the Arkansas legislature to pass the 1935 act whereby Arkansas courts were prohibited from setting aside certain types of defective tax sales "by any proceedings at law or in equity." At the time that act was passed, more than

---

[15] *Indiana ex rel. Anderson* v. *Brand,* 303 U. S. 95.

25% of the real property in the state was tax delinquent.[1] Loss of revenue from so substantial a portion of the state's total acreage was a serious matter. In the eyes of some people, the land could be sold and the lost revenues recouped if some of the formal grounds on which tax titles could be invalidated were rendered unavailing.[2] It seems clear that the 1935 legislature was persuaded of the wisdom of such a step. But it also seems clear that the 1935 act was repealed in 1937 because the legislature became convinced that the law had worked directly contrary to the state's policy of obtaining the benefits believed to flow from continuity of possession by home owners and farmers,[3] that it had accomplished inequitable results, that it had thereby "operated injuriously to the interests of the State, and that sound policy dictated its repeal."[4] This is apparent from reading that part of § 2 of the repealing act of 1937 which declared that "said Act 142, Acts 1935, ignores jurisdictional prerequisites to effect valid sales of tax delinquent lands, as prescribed by law, and has brought the laws of

---

[1] Ark. Acts 1935, No. 119, § 12. In Desha County, where the lands here involved are located, tax delinquency as of December 31, 1933, amounted to 57.5%. This was the highest figure reported for any county in the state. Realty Tax Delinquency (Bureau of the Census, 1934) Vol. I, part II, Arkansas, pp. 3–4. And see Brannen, Tax Delinquent Rural Lands in Arkansas (University of Arkansas, College of Agriculture, Bulletin No. 311, 1934) *passim*.

[2] Brannen, Tax Delinquency in Arkansas, 15 Southwestern Social Science Quarterly 201, 206–207 (1934); Brannen, Tax Delinquent Rural Lands in Arkansas, *supra*, p. 35. And see *Berry* v. *Davidson*, 199 Ark. 276, 280; 133 S. W. 2d 442.

[3] Arkansas has expressed its continuing solicitude in this regard by numerous acts of its legislature. For example, by such an act Arkansas taxpayers were permitted to retain title to their real property for three years by paying taxes for only one year. See Third Biennial Report, Arkansas State Tax Commission (1931–32) p. 6.

[4] *Ochiltree* v. *Railroad Co.*, 21 Wall. 249, 251.

the State incident thereto into doubt and confu-
sion . . ."

Both the 1935 act and the 1937 act repealing it touch
on Arkansas' policy as to taxation, tax forfeiture, and land
ownership—matters of public policy which are of vital
interest to the state and all its citizens. It was a matter
of serious moment to Arkansas that 25% of the state's
privately owned land—homes, farms, and other property—
was in jeopardy of being taken from its owners because of
inability to pay taxes. If only 50% of the forfeitures
were homes and farms, simultaneous ouster of so many
citizens could result in forced migrations and discontents
disastrous in their consequences. The manifestations of
financial distress revealed by the widespread delinquency
spotlighted conditions which called for the best in legisla-
tive statesmanship. To seek a rational and fair solution
to the problem was not only within the power of Arkansas'
lawmakers, but was also their imperative duty. Without
attempting to judge the wisdom or equities of either act,
it is easy to see that both the 1935 and the 1937 act repre-
sented rational and understandable attempts to achieve
such a solution. To hold that the contract clause of the
Federal Constitution is a barrier to the 1937 attempt to
restore to the distressed landowners the remedy partly
taken away by the 1935 act is, in my view, wholly incon-
sistent with the spirit and the language of that Consti-
tution.

As already stated, Arkansas was not faced with a prob-
lem peculiar to that state alone. At the depth of the
depression, over 20% of all real property in the United
States was tax delinquent.[5] Nor was Arkansas alone in
seeking to do something about the situation. "Since 1928

---

[5] Realty Tax Delinquency, (Bureau of the Census, 1934) Vol. 1,
pp. 6–7. By states, tax delinquency varied from a low of 6% in
Massachusetts to a high of 40.5% in Michigan. North Dakota (37.5%),
Illinois (37%) and Florida (36%) followed close after Michigan.

nearly every state in the Union has enacted legislation dealing with the problem of delinquent taxes and a number of states have completely remodeled their systems of tax delinquency laws. This legislative activity has been called forth by the unprecedented increase just before and during the depression in the amount of unpaid property taxes and by the consequent threat both to the financial stability of state and local governments and to the security of private property." [6] By acts passed in the single year of 1933, twelve states extended the time for paying taxes already due, eleven states postponed sales for taxes, twenty-six states (among them Arkansas) waived or reduced penalties and interest on taxes already delinquent or for which property had already been sold, nine states (among them Arkansas) lengthened the period of redemption on property already sold, and sixteen states permitted payment of already delinquent taxes in installments spread over a period of years.[7]

The states, and the federal government also, were faced with a "financial crisis [which had] the same results as if it were caused by flood, earthquake, or disturbance in nature." [8] The federal government greatly expanded facilities for farm loans; set up the Home Owners Loan Corporation; practically underwrote the nation's banking system; passed the Frazier-Lemke Act; widened the scope of bankruptcy jurisdiction; and embarked on a system of nationwide relief. In the states,

[6] Putney, Tax Delinquency in the United States, in Editorial Research Reports (Vol. II, 1935) 327. And see Fairchild, The Problem of Tax Delinquency (1934) 24 American Economic Review 140, 144.

[7] Proceedings of the National Tax Association (1933) 28–30; cf. id. (1934) 30–31. For a complete list of changes in tax collection procedure made during the 1930–1934 period, see Realty Tax Delinquency (Bureau of the Census, 1934) Vol. 1, pp. Ia–IIi.

[8] Justice Olsen of the Minnesota Supreme Court, as quoted in *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 423.

part of the effort to meet the crisis took the form of mortgage and tax moratoria; part took other forms, including that of the legislation now before us. All may well be considered parts of the larger and over-all effort to avert cataclysmic changes which were thought to threaten the equilibrium and tranquility of our society. This Court, in its notable decision in *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, upheld that phase of the Minnesota effort which took the form of a mortgage moratorium. In the course of the opinion, the Court quoted the state Attorney General, who in his argument here had stated: " 'Tax delinquencies were alarmingly great, rising as high as 78% in one county of the state. In seven counties of the state the tax delinquency was over 50%. Because of these delinquencies many towns, school districts, villages and cities were practically bankrupt' . . . [and] serious breaches of the peace had occurred." [9] The policy behind mortgage moratoria and the policy behind tax leniency to landowners are inextricably intertwined.[10] The basic philosophy of the two types of legislation is identical. For encouragement of home and farm ownership has always been treated as a major objective of our social and governmental policy. And therefore what was said in the *Blaisdell* case with reference to the contract clause is equally applicable here: "Not only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end 'has the result of modifying or abrogating contracts already in effect.' *Stephenson* v. *Binford*, 287 U. S. 251, 276. ' Not only are existing laws

---

[9] *Home Building & Loan Assn.* v. *Blaisdell, supra,* at 424.

[10] Cf. The Farm Debt Problem, Letter from the Secretary of Agriculture (73rd Cong., 1st Sess., House Doc. No. 9) pp. 26–29.

read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order." [11]

So much for the general setting which gave rise to the law here held invalid. In order better to understand the effect that law had on the appellants and the appellee, it is necessary to consider other provisions of Arkansas law.

At the time appellants secured from the state a quitclaim deed to the lands here in question, the law provided two alternative means of assuring purchasers of tax forfeited lands against loss:

(1) Such purchasers, under certain circumstances, could hold on to the land through the protection afforded by the remedial processes of the courts; [12]

(2) In case they could not hold on to the land, such purchasers were afforded the protection of a judicially enforceable right to be reimbursed by the landowner for the amount paid out for purchase price and subsequent taxes, with interest, as well as for improvements—all in the event that the former owners of the land should for any reason be able to prove that the lands had never been validly forfeited. Ark. Dig. Stats. (Pope, 1937) §§ 4663–4665, 13881.

---

[11] *Home Building & Loan Assn.* v. *Blaisdell, supra,* at 434–435.

[12] There were three principal ways by which purchasers of tax titles could hold on to the land:

(1) By acquiring a valid tax deed. (The tax deeds here were admittedly invalid under the laws existing at the time of forfeiture.)

(2) By two years open and adverse possession. (Though over two years had elapsed between the date of purchase and the beginning of this litigation, the courts below found that the purchasers had not availed themselves of this remedy.)

(3) By failure of the former landowner to compensate the purchaser for his expenditures. (The order of the court below provided that such compensation be paid.)

The Arkansas legislature, by Act 264 of 1937, narrowed the circumstances under which purchasers might hold on to the land. But the second alternative assurance remained intact.

From my study of the case I am of opinion that:

(1) The 1937 Arkansas statute here attacked neither impaired nor sought to repudiate any contractual agreement or obligation expressly or impliedly assumed by the state;

(2) The 1937 Arkansas statute was enacted well within the state's general legislative powers and is in no way inconsistent with the true intent and fair interpretation of the federal constitutional prohibition which commands that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . ."

*First.* The state, by quitclaim deeds, without any express warranty whatever, conveyed the lands in question to appellants. It is appellants' claim that an "obligation of the contract created by the grant of the State" has been impaired by the Arkansas statute. Stripped of surplus verbiage, appellants' naked contention is that Arkansas, by its quitclaim sale and conveyance, obligated itself to refrain from thereafter passing a general legislative enactment if such enactment would affect in any manner any of the legal means provided to protect tax sale purchasers against loss. We need not here consider whether under the Arkansas Constitution the legislature could have thus bargained away the state's legislative power in setting up a scheme for the sale of tax forfeited land. For there was no attempt on the part of the state officials who made the sale to exercise any such extraordinary authority.

A deed to property without warranty is an agreement to transfer whatever title the grantor has. And even without express language to that effect in the conveyance, it is reasonable to say that a valid quitclaim con-

veyance carries along with it an implied obligation that the grantor will not repudiate the grant and attempt to reassert title in himself, for such a reassertion of title would be contrary to the express purpose which actuated the parties in reaching the agreement which ended in the conveyance. The implied obligation not to reassert title was the basis of the decision in *Fletcher* v. *Peck,* 6 Cranch 87, a decision which this Court relies on in the case at bar. Cf. *Satterlee* v. *Matthewson,* 2 Pet. 380, 414–415. In *Fletcher* v. *Peck,* the court said: "A contract executed, as well as one which is executory, contains obligations binding on the parties. A grant, in its own nature, amounts to an extinguishment of the right of the grantor, and implies a contract, not to reassert that right. A party is, therefore, always estopped by his own grant." [13] What the State of Georgia did in that case was to seek to reassert title to land which the court found it had conveyed for a consideration under what the court deemed to be a valid contract. True, Georgia was not a party to the actual litigation, but by purporting to convey to one purchaser land which had already been conveyed by it to another purchaser the state clearly attempted to assert that it still had title to the land. Here the State of Arkansas has not repudiated any implied obligation by attempting to reassert title in the lands whose ownership is now in issue. There is no litigation here between the state and its grantees, and none, as in *Fletcher* v. *Peck,* between rival grantees of the state. Appellee claims title through an owner whose estate Arkansas had purportedly forfeited for unpaid taxes. Neither in the facts of this case nor in the legislation attacked is there any kind of challenge to the validity of

---

[13] 6 Cranch 87, 137. In that case Mr. Justice Johnson denied that the impairment of contract clause was intended to apply to contracts already fully executed. *Id.,* at 145. That question, however, is not material to the point here under discussion.

the state's conveyance of all the title the state possessed. As pointed out above, *Fletcher* v. *Peck* rested upon the assumption that there was a continuing obligation on the part of the state, as on the part of any other grantor, not to repudiate a valid conveyance and attempt to reassert a claim to property which had been sold. Such a ruling offers no support to the contention that Arkansas, in quitclaiming all its interest to appellants, thereby assumed a continuing contractual obligation that its legislative department would in no way alter the procedural rules to be followed by the Arkansas courts in adjudicating controversies between the state's grantees and the original owners whom the state had attempted to divest of their property by the drastic method of forfeiture. "The trouble at the bottom of the . . . case is that the supposed promise . . . on which it is founded does not exist. If such a promise had been intended it was far too important to be left to implication." *Knoxville Water Co.* v. *Knoxville,* 189 U. S. 434, 436. "The patent [here, the quitclaim deed] contains no covenant to do or not to do any further act in relation to the land; and we do not, in this case, feel at liberty to create one by implication." *Jackson* v. *Lamphire,* 3 Pet. 280, 289. "A contract binding the State is only created by clear language, and is not to be extended by implication beyond the terms of the statute. . . . In the case at bar . . . the act . . . operated in no manner as a restraint on the legislature or as a contract upon its part that the State would not act whenever in its judgment it perceived the necessity for an additional ferry. . . . No promise made by the legislature by the first act is broken by the second." *Williams* v. *Wingo,* 177 U. S. 601, 603, 604. "There is no undertaking on the part of the State with the purchaser that the remedy prescribed in this statute, and no other, shall be pursued, unless it is to be implied from the mere presence of the provision in the statute,

and we think it is well settled that no such implication arises." *Wilson* v. *Standefer*, 184 U. S. 399, 410.

In this case Arkansas has fully complied with the express terms of its contract. For there was certainly no express obligation on the part of Arkansas that its general laws concerning forfeiture of property and sale of land should remain static. Nor do I believe that any such obligation can properly be implied. Arkansas did not agree with the appellants that it would keep on its statute books legislation which in effect forfeited its citizens' lands in a way and manner which was directly in the teeth of what had been the Arkansas law at the time the alleged forfeitures occurred. And I do not believe that we should compel the accomplishment of such a result by what I conceive to be a stretching of the contract clause of the Federal Constitution.

*Second.* Measured either by the constitutional provision itself or by that provision as construed by prior decisions of this Court, I am of opinion that the Arkansas statute is consistent with what was referred to in *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 438–439, as the true intent and fair interpretation of the contract clause.

Writing in 1817, Judge Livingston, of the Federal Circuit Court of New York, had this to say of the contract clause: "There is not, perhaps, in the Constitution any article of more ambiguous import, or which has occasioned, and will continue to occasion, more discussion and disagreement, . . . or the application of which to the cases which occur will be attended with more perplexity and embarrassment. . . . and it will not be surprising if, in the discharge of it, great diversity of opinion should arise." *Adam* v. *Storey,* Fed. Cas. No. 66; 1 Paine's Rep. 79, 88–89. In *Home Building & Loan Assn.* v. *Blaisdell, supra,* written in 1933, appears a resumé of previous decisions which

substantiate the accuracy of Judge Livingston's prophecy. And in the *Blaisdell* case this Court quoted a statement originally made by Justice Johnson in *Ogden* v. *Saunders*, 12 Wheat. 213, 286: "But to assign to contracts, universally, a literal purport, and to exact for them a rigid literal fulfilment, could not have been the intent of the constitution. It is repelled by a hundred examples. Societies exercise a positive control as well over the inception, construction, and fulfilment of contracts as over the form and measure of the remedy to enforce them." The accuracy of this statement cannot be questioned by one who reflects upon the extent to which contracts and agreements are a part of the daily activities of our society. For, so nearly universal are contractual relationships that it is difficult if not impossible to conceive of laws which do not have either direct or indirect bearing upon contractual obligations. Therefore, it would go far towards paralyzing the legislative arm of state governments to say that no legislative body could ever pass a law which would impair in any manner any contractual obligation of any kind. Upon a recognition of this basic truth rests the decision in the *Blaisdell* case. Such recognition was made clear by the use of the following expressions, either quoted and implicitly approved, or used for the first time: "the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula"; "No attempt has been made to fix definitely the line between alterations of the remedy, which are to be deemed legitimate, and those which, under the form of modifying the remedy, impair substantial rights. Every case must be determined upon its own circumstances"; "In all such cases the question becomes, therefore, one of reasonableness, and of that the legislature is primarily the judge"; "The question is not whether the legislative action affects contracts incidentally, or directly or indirectly, but

whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end"; "If it be determined, as it must be, that the contract clause is not an absolute and utterly unqualified restriction of the State's protective power, this legislation is clearly so reasonable as to be within the legislative competency." 290 U. S. 398, 430, 438, 447.

The *Blaisdell* decision represented a realistic appreciation of the fact that ours is an evolving society and that the general words of the contract clause were not intended to reduce the legislative branch of government to helpless impotency. See *Veix* v. *Sixth Ward Building & Loan Assn.*, 310 U. S. 32, 38. Whether the contract clause had been given too broad a construction in judicial opinions prior to the *Blaisdell* decision is not now material. And whether I believe that the language quoted from the *Blaisdell* opinion constitutes the ultimate criteria upon which legislation should be measured I need not now discuss. For I am of opinion that the Arkansas statute, passed in pursuance of a general public policy of that state, comes well within the permissible area of state legislation as that area is defined by the *Blaisdell* case and the decisions upon which that case rests.[14]

---

[14] The only part of the *Blaisdell* decision mentioned by the Court in the case at bar is a passage quoting a statement which in *Blaisdell* the Chief Justice quoted from *Von Hoffman* v. *City of Quincy*, 4 Wall. 535, 550, 552: "the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." The Court now quotes this language as the governing law. In the *Blaisdell* case, however, the Chief Justice followed the quotation with this statement: "But this broad language cannot be taken without qualification. Chief Justice Marshall pointed out the distinction between obligation and remedy. *Sturges* v. *Crowninshield, supra* [4 Wheat. 122], p. 200. Said he: 'The distinction between the obligation of a contract, and the remedy given

As has already been pointed out, the forfeiture in the case at bar was wholly invalid under what was the governing law at the time of such forfeiture. That invalidity was rendered unavailing to the land's former owners—and to all other owners similarly situated—by the 1935 act. As has also been pointed out, experience evidently demonstrated to the legislature that the best interest of all the people of the state was not served by the change effected by the 1935 act; hence its repeal in 1937. In Arkansas, as appellants argue here, "these actions to cancel tax deeds are in their essential nature nothing more or less than suits to redeem the property . . ." And it has long been recognized as the law in Arkansas that "the right to redeem lands from a tax sale depends upon the statute in force at the date of the sale." *Thompson* v. *Sherrill*, 51 Ark. 453, 458; 11 S. W. 689; *Groves* v. *Keene*, 105 Ark. 40, 43; 150 S. W. 575. At the time of the forfeiture and sale to the state, Arkansas law protected the purchaser by providing that he should be reimbursed and made whole in case his tax purchase was set aside for irregularity. That protection is today afforded to the full extent that it was when ap-

---

by the legislature to enforce that obligation, has been taken at the bar, and exists in the nature of things. Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct.' " *Home Building & Loan Assn.* v. *Blaisdell, supra*, at 430. And Chief Justice Marshall, elaborating his views of this same subject in his dissenting opinion in *Ogden* v. *Saunders*, 12 Wheat. 213, 343, 353, said: "We have, then, no hesitation in saying that, however law may act upon contracts, it does not enter into them, and become a part of the agreement. The effect of such a principle would be a mischievous abridgment of legislative power over subjects within the proper jurisdiction of States, by arresting their power to repeal or modify such laws with respect to existing contracts." "We think, that obligation and remedy are distinguishable from each other. That the first is created by the act of the parties, the last is afforded by government."

pellants bought the land; the repealing act of which appellants complain did not take away any part of that right. From all of this it is manifest that the entire plan of the state in connection with tax sales, both before and after the repealing act of 1937, shows a scrupulous desire to provide compensation for the purchaser in order that he may not suffer pecuniary loss, whatever may be the consequences of a suit for the land. And the whole course of legislation in Arkansas shows a desire to be fair both to the purchaser of tax forfeited land and to the former owners whose land is about to be lost by reason of the drastic device of forfeiture. Cf. *Curtis* v. *Whitney,* 13 Wall. 68, 71. I cannot believe that the true intent and interpretation of the contract clause prohibits Arkansas from making such an effort to preserve the rights of both the landowner and the one who claims the landowner's forfeited property. Arkansas has not here taken away appellants' "entire remedy" but has done so "in part only." *Mason* v. *Haile,* 12 Wheat. 370, 378. I am willing to concede that there may be a "vast disproportion between the value of the land and the sum for which it is usually bid off at such sales." *Curtis* v. *Whitney, supra,* at 70. But assuming that the tax forfeited land here was obtained at such a bargain, I am still of the opinion that these appellants—who have the right to their money, with interest—have been denied no right guaranteed by the contract clause. And in this connection it is not to be forgotten that appellants could have obtained a perfect title by openly and adversely holding possession of the land for two years—a privilege which the state courts finally and authoritatively found had not been exercised. Tax sold properties are undoubtedly bought with the knowledge on the part of those who speculate[15] in them that states ordinarily

---

[15] *Treat* v. *Orono,* 26 Me. 217; *Lisso & Bro.* v. *Natchitoches,* 127 La. 283; 53 So. 566; *Lynde* v. *Melrose,* 10 Allen (Mass.) 49. And

adopt a liberal policy in order to protect property owners from tax forfeiture. And even granting that we could enter into questions of policy, I would be unable to reach the conclusion that Arkansas, by repealing its 1935 statute, acted "without . . . reason or in a spirit of oppression." *W. B. Worthen Co.* v. *Kavanaugh*, 295 U. S. 56, 60. It would seem to me to be difficult to support an argument that Arkansas was acting either unreasonably, unjustly, oppressively, or counter to sound public policy in adopting a law which, without depriving purchasers of the right to recover their money outlay, with interest, sought to make the way easy for former home owners and property owners of all types to reacquire possession and ownership of forfeited property. If under the contract clause it is justifiable to seek to find "a rational compromise between individual rights and public welfare," *Home Building & Loan Assn.* v. *Blaisdell, supra,* at 442, then it seems to me that this is a case for the application of that principle. I do not believe that the Arkansas legislature is prohibited by the Federal Constitution from adopting the public policy which the decision of the Arkansas Supreme Court has upheld in this case. "Especial respect should be had to such decisions when the dispute arises out of general laws of a State, regulating its exercise of the taxing power, or relating to the State's disposition of its public lands." [16]

MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY concur in this opinion.

---

see Upson, Local Government Finance in the Depression, 24 National Municipal Review 503, 506. ("Ordinarily, in important communities tax-title buying has been in the hands of professional buyers interested in securing a quick turnover of investments and by no means desiring to get into the real estate business through the actual acquisition of properties.")

[16] *Wilson* v. *Standefer*, 184 U. S. 399, 412.