## SHERIDAN–WYOMING COAL CO., Inc. v. KRUG.

### No. 9946.

United States Court of Appeals
District of Columbia Circuit.
Argued Dec. 9, 1948.
Decided Jan. 31, 1949.

EDGERTON, Circuit Judge, dissenting.

Mr. T. Peter Ansberry and Mr. Stephen J. McMahon, Jr., both of Washington, D. C., for appellant.

Mr. Roger P. Marquis, of Washington, D. C., Attorney, Department of Justice, with whom Mr. A. Devitt Vanech, Asst. Atty. Gen., and Mr. John C. Harrington, of Washington, D. C., Attorney, Department of Justice, were on the brief, for appellee.

Mr. Ward E. Lattin, of Washington, D. C., filed a brief on behalf of Big Horn Coal Company as amicus curiae, urging affirmance.

Before EDGERTON, CLARK and PRETTYMAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

The Sheridan-Wyoming Coal Company, Inc., brought a civil action in the District Court of the United States for the District of Columbia to restrain the Secretary of the Interior from delivering to the Big Horn Coal Company certain leases for federal coal lands. The Secretary moved to dismiss. The court granted that motion upon the grounds that plaintiff had no standing to sue and that the power of the Secretary to grant coal leases is discretionary, not subject to judicial review, and not diminished or restricted by his regulations, specifically Section 193.3 of Title 43, Code of Federal Regulations. Sheridan-Wyoming appealed.

Upon the appeal, this court agreed with the District Court that merely as a member of the coal industry threatened with a new competitor, Sheridan-Wyoming had no standing to sue, citing Alabama Power Co. v. Ickes[1] and similar cases. But Sheridan-Wyoming argued that it was a lessee of federal coal lands, that the regulation mentioned (43 Code Fed.Regs. § 193.3) was part of its lease, and that it thus had a property right threatened with invasion by the proposed leases to Big Horn, relying upon Baltimore & Ohio R. R. v. United States[2] and similar cases. As to that contention, this court said:[3]

"The difficulty with the contention in the present case is that no such claim was stated in the complaint. Appellant did not allege in its complaint that it was or is the lessee of federal coal lands, or indicate the nature, content or extent of any lease."

This court, therefore, refused to consider the contention and affirmed the judgment of the District Court but in the mandate gave that court authority to entertain a motion to amend the complaint. Such a motion was presented, offering an amended complaint which contained an allegation that Sheridan-Wyoming was a lessee of federal coal lands, attaching a copy of the lease, and otherwise alleging the facts concerning the lease theretofore presented in the course of the argument in this court. The District Court denied the motion to amend, saying:

"It is the opinion of this Court that the proposed new matter adds nothing material to the claim and issue presented by plaintiff in its original complaint and, hence, granting leave to amend the complaint by adding the proposed new matter would be idle and would needlessly prolong the litigation."

It seems to us perfectly clear that the proposed amendment did add something new and material to the claims and issue presented by the plaintiff. The status of one suing merely as a member of an industry to enjoin threatened competition, and the status of one claiming a property right by contract, threatened with invasion, are wholly different.[4] The original complaint in the present case rested on the former status. The amended complaint rested also upon the latter. Moreover, we think this court made clear in its opinion upon the first appeal that plaintiff's rights as a member of the coal industry and its rights as owner of a property right by contract were different. We held that as the former it had no standing to sue. But we pointed out that under the Baltimore & Ohio and kindred cases persons claiming protection against threatened invasion of

[1] 1938, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374.

[2] 1924, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667.

[3] Sheridan-Wyoming Coal Co. v. Krug, 1948, 83 U.S.App.D.C. —, 168 F.2d 557, 558.

[4] Compare Alabama Power Co. v. Ickes, supra, with Frost v. Corporation Commission, 1929, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483.

property rights, created by contract upon valid regulations, were entitled to sue.

It is true that the language in the mandate from this court upon the first appeal was, in part: "with leave to the District Court to dispose of such motion, if made, in such manner as in its discretion seems proper". It is elementary that a trial court has wide discretion in respect to amendments which are not of right. But that discretion may be controlled by the opinion of this court, and the discretion mentioned in the mandate was likewise circumscribed by that opinion. Moreover, such discretion as the trial court had, or was given, could not deprive this court of its appellate jurisdiction over decisions of that court upon questions of law. The Supreme Court, in United States v. Lehigh Valley R. R.,[5] had for consideration a refusal of a trial court to permit an amendment in a matter governed by the opinion of the Supreme Court in a prior appeal. The Court held the refusal to be "an absolute abuse of discretion" and expressed the extent of its meaning by adding "even although such abuse was obviously occasioned by a misconception of the character of the action of this court and the scope of the mandate."

We now adhere to our original view that plaintiff's status as a lessee of federal coal lands under a lease which incorporated a valid regulation governing such leases, would be materially different from its status as a mere member of the coal industry. Since the District Court denied the motion to amend upon a contrary view of that proposition, and upon that contrary view alone, its judgment must be reversed.

Both appellant and appellee have now twice argued fully before this court the nature of Sheridan-Wyoming's status as lessee under its lease and the regulation which is involved. This litigation has already consumed a long time. Therefore, in remanding the case for further proceedings, we deem it to be in the interest of justice that we now express our view upon that question for the guidance of the District Court in those further proceedings.

We must first have a careful understanding of what is shown by the record to have occurred. Those events relate to Sheridan-Wyoming's lease, the Departmental regulation, Big Horn's application for a lease, and the Secretary's proposed disposition of that application.

**Sheridan-Wyoming's Lease.** The coal lands involved are in and around Monarch, Wyoming. The coal is a low-grade subbituminous, known as Sheridan area coal. It is high in moisture and almost wholly lacking in stocking qualities. Consumers buy it for immediate use, and mines producing it are unable to maintain steady production throughout the year.

Sheridan-Wyoming was organized in 1920. Substantial portions of the investment in its operations were made long prior to 1934, when the regulation hereinafter discussed was promulgated. It had been a lessee of federal coal lands for many years. Its present lease was executed in September, 1943.

**The Regulation of the Department.** In 1933 or thereabouts the Department became concerned over the plight of the coal industry upon its lands "and the dread effect of that menacing history upon the public interest." The leasing act[6] gave the Secretary discretionary power to issue coal leases and to withdraw coal lands from lease.[7] In 1934 he wrote letters to the Director of the Bureau of Geological Survey and to the Commissioner of the General Land Office containing identical language as follows:

"In the present situation of the coal industry it is desirable that very few, if any, new coal leases or prospecting permits be issued.

"Taking into consideration, however, that there may be some cases where new small coal mines for local needs are advisable and that there may also be cases where leases for shipping mines should

---

[5] 1911, 220 U.S. 257, 271, 31 S.Ct. 387, 390, 55 L.Ed. 458, 463.

[6] Act of Feb. 25, 1920, 41 Stat. 437, 30 U.S.C.A. § 181 et seq.

[7] United States v. Wilbur, 1931, 283 U.S. 414, 51 S.Ct. 502, 75 L.Ed. 1148.

285

not be denied, it is thought that no general order should be issued in effect suspending the leasing act as to new coal leases and prospecting permits. It is believed that substantially the same result can be reached by declining to offer coal lands for lease or to grant prospecting permits unless an actual need is shown for coal which cannot otherwise be reasonably purchased or obtained."

Thereupon the Secretary promulgated the following regulation:

"The General Land Office will make favorable recommendation that leasing units be segregated and that auctions be authorized only in cases where there has been furnished a satisfactory showing that an additional coal mine is needed and that there is an actual need for coal which cannot otherwise be reasonably met."

This regulation was duly published in the Federal Register as part of the Code of Federal Regulations.[8]

Subsequently the regulation was construed by the Department thus: "In such case [i. e., where there is already sufficient productive capacity in the vicinity to meet the demands of the market], the rule of the Department precludes the granting of an additional coal lease (43 Code Federal Regulations 193.3)."[9] In the proffered amended complaint, it is alleged that that ruling represents the heretofore uniform rule of the Department for fourteen years.

**Big Horn's Application.** The Big Horn Coal Company was incorporated on December 20, 1943. Prior to that incorporation, the persons interested had, on December 2, 1943, procured from the State of Wyoming a lease on certain coal lands belonging to that State, which had theretofore been leased to one Turner, who was unable to meet his commitment. On December 18, 1943, still prior to formal incorporation, the Big Horn people applied for a lease of federal lands adjoining those under lease to Sheridan-Wyoming. The complaint alleges that this application was on the ground that federal land was necessary

to the commencement of the new mine.[10] Big Horn did not allege or attempt to show that there was or is a market need for additional coal, which showing is the one requisite for a new lease prescribed by the regulation. Big Horn proceeded to mine its State of Wyoming properties and thereby developed a large business.

**The Secretary's Proposed Disposition of Big Horn's Application.** The Secretary took no action on Big Horn's application for a federal lease until two years later, when he offered that lease at public auction. Big Horn was the only bidder, and its tender of the first year's rental was accepted. But a number of protests were filed, and no further action was taken for more than a year. Then the protests were dismissed and Big Horn was awarded the right to the lease. In denying the protests, the officials of the Department said, in part:

"This office will not countenance any deliberate attempts to circumvent the above quoted regulation. The opening of a mine on non-public lands only after an application has been filed for a lease on adjacent public land, will not, where such action is taken to effect the circumvention noted, be recognized as vesting any rights on which the granting of the lease may be based. However, the existence of such bad faith will not be presumed in the absence of clear proof thereof. In this instance, the Big Horn Company has alleged its complete bona fides and it is not believed that the evidence submitted by the protestants is sufficient to establish the contrary.

"As to the question of need for an additional mine, it has long been established that Section 193.3 does not apply in cases where Federal lessees seek additional lands as a reserve against imminent exhaustion of workable deposits in an existing mine. (Sec. 43, C.F.R. 193.15). The principle is the same whether that mine is on Federal, state or privately owned lands. The regulation was not intended to be and will not be invoked to drive a going concern out of business.

---

[8] 43 Code Fed. Regs. § 193.3 (1938).
[9] Carl T. Olson, A. 24226 (Dec. 19, 1946). A similar ruling was made in Lyman Ray Cox, A. 24405 (Sept. 3, 1946).

[10] Allegations in the complaint must be treated as true for purposes of the motion to dismiss.

"In the instant case, the usual criteria for determining the need for a new mine under section 193.3 do not apply because, at the time the Big Horn applications were acted on by the Department and the lease offered at public auction, that company was an active existing mine with a large annual production, and because of the further circumstances that (1) the Big Horn Company has been in operation for about three years and the evidence fails to disclose that its operation has jeopardized the continuance of the competing Sheridan-Wyoming mine (2) both companies apparently serve customers over a very large area embracing several states in which there are numerous other active mines, (3) both companies produce a type of coal which is not readily storable and which has limited uses."

The protestants, including Sheridan-Wyoming, moved for rehearing. The motion was denied. The Department said, in part:

"In these circumstances, it cannot be said that the Big Horn Coal Company did not open a new mine on the state land. Thus, if consideration of this matter were to be limited to the events of December 1943, it would follow that the requested lease would not issue.

"Thus to limit consideration of this case, however, would be to ignore events subsequent to December 1943. The facts are that since December 1943, without encroaching on federal lands, the Big Horn Coal Company has successfully opened a large mine and built a business of some proportion. To issue the lease as of today is merely to permit the continuance of what events have demonstrated conclusively to be a large, going business. It would accommodate the expansion of an existing mine which is running out of coal reserves."

Referring to the ruling on the regulation in the Olson case,[11] the Department said:

"In the Olson case, as in cases which have followed it, there was no question concerning the expansion of an existing, operating, going mine. In none of those cases had there been any substantial investment made in connection with opera-

tions on non-federal lands. None of them involved a situation where under leases issued by a State government, a mine operator had obtained markets, acquired customers, and established valuable good will, where machinery and equipment had been acquired and were being used currently in the business of mining a large tonnage of bituminous coal."

Sheridan-Wyoming and the protestants then moved for the exercise of the supervisory power of the Secretary. The motion was denied in a memorandum by the Secretary, in which he said, in part:

"It is also suggested that the Department's interpretation of the regulation in its decision of July 29, 1947, will encourage evasion of the regulation by those who will seek to extend their mining operations onto Federal lands from a mere foothold on non-Federal lands. But the decision of July 29, 1947, carefully described the large, going business interprise established on the State land by Big Horn. The very competition of which Sheridan-Wyoming complains is evidence that Big Horn has secured more than a mere foothold in the industry without the use of Federal coal reserves. What the decision would be were a case presented where a new mine opened on non-Federal lands with inadequate reserves to enable it either to exist for any period of years or to establish a position of importance in the industry through successful mining and sales of its coal in relatively large volume is not a matter for determination in this proceeding."

It is not claimed by the Secretary that a market need for additional coal has been shown or suggested.

The foregoing are, in brief, the facts upon which Sheridan-Wyoming's status to sue, as established by the complaint, the amended complaint, and the exhibits thereto, must be determined. Preliminary to the affirmative considerations which lead to a conclusion, we note that the ground upon which the Secretary proposes to issue the Big Horn lease in spite of his regulation, is singularly unimpressive. The reason he assigns is that Big Horn has a large, established business and so, although

---

[11] Supra note 9.

the lease would not have been granted as of the date of the application, it must now be granted. The fact is that Big Horn made its application even before it was incorporated, and all its big business has been built up with full knowledge that it had no federal lease. It has now, according to the Secretary's view, hoisted itself by its own bootstraps.

The Secretary does not claim that the regulation is invalid, and he does not propose to withdraw it or modify it. He does not claim that its sole recited condition for a new lease has been met. He does not deny the construction which he has hitherto given it. He proposes to write an exception into it. He says that it was not intended to apply to the granting of a new lease to an existing company with a large business which alleges that it needs this coal to perpetuate that business. No such exception can be gleaned from the terms of the regulation or from fourteen years of administrative construction.

Sheridan-Wyoming, on the other hand, also has an investment and a good business, which it has established in reliance upon and not in the teeth of the Departmental regulation. The proposed exception would strip from that lease one of its most valuable conditions, a condition established by the Secretary for the declared purpose of protecting then-existing lessees against ruin.

The "good faith" of Big Horn, upon which the Secretary rests his present position, has no relevance to the issue here presented. Of course Big Horn acted in good faith. It applied for a federal lease the day it was organized and, according to the complaint, was perfectly frank in stating that the federal land was necessary to its proposed venture. It never at any

time, so far as this record shows, attempted to gloss over the fact that it desired the regulation either changed or ignored.

The propositions which lead to a conclusion may be succinctly stated. They are:

■ 1. The regulation of the Secretary (43 Code Fed.Regs. § 193.3) was valid. He had power to withdraw lands from leasing and so could impose the conditions upon which he would lease.[12]

■ 2. The regulation was published in the Federal Register as one of general applicability and legal effect.[13] It had the force and effect of statute. As such, it was binding upon the Secretary until repealed or modified by him.

Judge Sanborn's opinion in Germania Iron Co. v. James[14] and Commissioner (now Circuit Judge) Frank's opinion in Consumers Power Company et al.[15] should be read in full upon this point. Other authorities are cited below.[16]

■ 3. The regulation meant what the Secretary held it to mean. When he promulgated it, he said it reached "substantially the same effect" as a withdrawing of the land from leasing. Thereafter he consistently held that it precluded the grant of leases to these lands unless market need for additional coal was shown.[17]

■ 4. The lease was expressly made subject to the Mineral Leasing Act. Its introductory clause recited that it was "under, pursuant and subject to the terms and provisions of the act of Congress, approved February 25, 1920 (41 Stat. 437) entitled * * *." The terms of a statute according rights and immunities to a vendee of government property are part of the obligation of the deed made pursuant to it.[18] A lease is no less a contract than

[12] 41 Stat. 438 (1920), 30 U.S.C.A. § 201; 41 Stat. 450 (1920), 30 U.S.C.A. § 189; United States v. Wilbur, supra note 7; United States v. Midwest Oil Co., 1915, 236 U.S. 459, 475, 35 S.Ct. 309, 59 L.Ed. 673, 682; United States v. Morrison, 1916, 240 U.S. 192, 36 S.Ct. 326, 60 L.Ed. 599; Stockley v. United States, 5 Cir., 1921, 271 F. 632.

[13] 49 Stat. 501 (1935), 44 U.S.C.A. § 305; 49 Stat. 503 (1935), as amended, 44 U.S.C.A. § 311.

[14] 8 Cir., 1898, 89 F. 811.

[15] 6 S.E.C. 444 (1939), Pike and Fischer, Admin. Law Dec. 33f.11-1.

[16] United States v. Perkins, 2 Cir., 1935, 79 F.2d 533; United States v. Dunton, D.C.S.D.N.Y.1923, 288 F. 959; Sibray v. United States, 3 Cir., 1922, 282 F. 795.

[17] Supra note 9.

[18] Wood v. Lovett, 1941, 313 U.S. 362, 370, 61 S.Ct. 983, 85 L.Ed. 1404, and cases there cited.

is a deed. Thus, while the regulation was not by specific terms incorporated in the lease, as a valid existing provision of law it was one of the conditions of the lease. It determined that contract to be one of a limited number of leases, a far different contract from a mere lease in an unrestricted potential number. The value of this condition is apparent. The regulation was promulgated to create that value, in the public interest, in the sense that it was designed to prevent the disaster of unrestricted leasing. The background and reason for the regulation were recited in the Secretary's memorandum in the Olson case, included in this record. He quoted descriptions of the coal industry from the opinions in Appalachian Coals, Inc. v. United States [19] and Sunshine Coal Co. v. Adkins,[20] and from Mr. Justice Cardozo's dissent in Carter v. Carter Coal Co.[21] To Sheridan-Wyoming the restriction meant that its commitments to mine the coal and to pay the royalties, and to make the prerequisite investments and expenditures, were protected against destruction of the market by the "anarchy" which had theretofore existed, and were supported by governmental adjustment of production to market needs.

5. Sheridan-Wyoming, as possessor of a valuable right, created by contract in the presence of valid and binding restrictive regulations, has standing to sue to protect that right.[22] The prevention of a breach of a restrictive provision in a contract is one of equity's most usual functions.[23]

■ The Secretary has wide discretion in the granting of federal mineral leases, but he has no discretion to violate or ignore an existing general departmental regulation which established one of the conditions upon which he entered into a contract of lease.

The judgment of the District Court is, therefore, reversed and the case remanded with instructions to that court to permit the filing of the proffered amended complaint and to deny defendant's motion to dismiss in so far as that motion rests upon the ground that plaintiff has no standing to sue. The temporary injunction heretofore issued by the District Court on June 4, 1948, will be continued in effect until final disposition of the action by that court.

Reversed and remanded for further proceedings in accordance with this opinion.

EDGERTON, Circuit Judge (dissenting).

Our former judgment was that the District Court might grant or deny a motion to amend the complaint "as in its discretion seems proper." That judgment became final long ago. This court now reverses it and requires the District Court to grant the motion. This reversal seems to me not only inconsistent with orderly procedure but probably beyond our authority.

I agree with the District Court that the proposed amendment of the complaint would add nothing material. On the former appeal we did not undertake to decide that question. I think the Department regulation on which this court now relies was not intended to be, did not appear to be, and was not a term or condition of appellant's lease. Its apparent purpose and effect were not to increase the rights of lessees, but to limit the expectations of applicants for leases. It did not purport to control the discretion of the Secretary in making leases, but only that of his subordinates in making "favorable recommendations." Moreover the United States is a necessary party when suit is brought to prevent the leasing of its lands.

---

[19] 1933, 288 U.S. 344, 361, 53 S.Ct. 471, 77 L.Ed. 825.

[20] 1940, 310 U.S. 381, 395, 60 S.Ct. 907, 84 L.Ed. 1263.

[21] 1936, 298 U.S. 238, 330, 331, 56 S.Ct. 855, 80 L.Ed. 1160.

[22] Frost v. Corporation Commission, supra note 4, and cases there cited. The proposition is much discussed in the opinions in recent cases involving radio broadcasting licenses. Federal Communica-

tions Comm'n v. National Broadcasting Co., 1943, 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374; Scripps-Howard Radio v. Federal Communications Comm'n, 1942, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229; Federal Communications Comm'n v. Sanders Radio Station, 1940, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869.

[23] Pomeroy, Equity Jurisprudence § 1341 (5th ed. 1941).