90 N.J. Super. 312 (1966)
217 A.2d 331
FRANCES TAYLOR, PLAINTIFF,
v.
PHILIP MITCHELL, ANNIE L. CARRIELL, RECO BUSINESS ASSOCIATES, INC., A NEW JERSEY CORPORATION, DEFENDANTS,
v.
PHILIP MITCHELL, FRANCES TAYLOR, AND ESTATE OF FRANK TAYLOR, THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided February 18, 1966.
*314 Mr. Frank Bozza, attorney for Frances Taylor and the estate of Frank Taylor.
Mr. Samuel March, for Annie L. Carriell.
Mr. Philip Mitchell, pro se.
HERBERT, J.S.C.
This is a contested foreclosure case. The note and mortgage were signed by defendant Annie L. Carriell on February 16, 1960. On their face they indicate a loan of $1,575. The property described in the mortgage is at 136 Badger Avenue, Newark. Mrs. Carriell held legal title to 136 Badger Avenue when the mortgage was signed. She also held legal title to property at 148 Badger Avenue.
Sometime after the making of the mortgage defendant Philip Mitchell brought suit in the Essex County District Court against Mrs. Carriell. He alleged that she was indebted to him, and in due course a judgment was entered against her in his favor for approximately $300. Then he docketed his judgment in the County Court and had execution issued and a levy made upon Mrs. Carriell's interest in 136 Badger Avenue and her interest in 148 Badger Avenue. A sheriff's sale followed, at which Mitchell's bid of $200 was the only one made. The sheriff's deed delivered to him is dated July 27, 1962, but was not recorded until July 19, 1963, about three months after the present foreclosure suit was started. The sheriff's deed to Mitchell is, however, alleged in the foreclosure complaint, and by cross-claim Mrs. Carriell seeks to have it set aside. She also contends that plaintiff is not entitled to equitable relief because the mortgage in question is tainted with fraud and is usurious; and she has pleaded, among many defenses, the doctrine of unclean hands.
*315 The transaction which produced the mortgage was arranged by defendant Mitchell. He had taken many would-be borrowers to the mortgagee, a man who called himself Frank Taylor. This was the fourth mortgage transaction with Taylor which Mitchell had arranged for the "benefit" of Mrs. Carriell. Mitchell was admitted to the New Jersey bar in 1923 when his name was Philip Gaudiosi. He was subsequently disbarred and has never been reinstated. His relationships with Taylor and with Mrs. Carriell began after his disbarment.
Taylor, the mortgagee, died on June 21, 1961. Plaintiff is his widow. She claims ownership of the mortgage by virtue of the fact that it is included among 26 mortgages described in an assignment to her from her husband, executed and acknowledged in March 1961. This assignment was found among Taylor's papers at the time of his death and was then recorded on June 23, 1961. It is significant in relation to matters to be discussed later that the recording was done by Philip Mitchell, an indication of his close relationship with the Taylors in connection with mortgage matters.
Although there is a question as to whether the assignment was delivered before Taylor died, that need not be resolved here. Plaintiff is also Taylor's executrix and there was an amendment during trial which brought her into the case in that capacity. She holds the note and mortgage either by assignment or as executrix.
Mitchell took almost complete charge of the loan transaction in February 1960. He prepared the note and mortgage. He had them executed by Mrs. Carriell. In spite of his disbarment he had a commission as a notary public and he took her acknowledgment on the mortgage. He searched the title. He recorded the mortgage. He obtained a check in the face amount of the mortgage, namely $1,575, had it endorsed by Mrs. Carriell, and then had it cashed.
At the trial Mitchell testified with much circumstantial detail about meeting Mrs. Carriell at a branch of the National Newark & Essex Banking Company in East Orange where she signed the note and mortgage and probably an affidavit of *316 title. He said she then gave the papers back to him and he put them in his brief case. He told her that he had to run the title down to date and no mortgage money could be turned over until that was done; that he would not be ready until the following day. He went on to say that she pleaded with him for some immediate cash because of her need. He responded by making out a check of his own to her order for $200. He could not recall where he was when he wrote the check but said he probably drove her to his bank so that she could cash the check. There was produced a check for $200 dated February 16, drawn upon the account of Philip Mitchell at the North Newark office of the National State Bank. It bears the endorsement of Mrs. Carriell as well as a bank stamp indicating that it was paid by the National State Bank on the 16th.
At the same session of the court Mitchell related that he again met Mrs. Carriell at the National Newark & Essex Bank in East Orange the next day, February 17, at which time he presented her with the Taylor check for $1,575. She cashed the check, paid Mitchell's "fee" of $250, and put the rest of the money in her purse, he said. Of this $250, $100 was for the placement of the mortgage, and $150 was for taking care of the "papers." He went on to testify that Mrs. Carriell then decided she would like to have a check for $1,000 instead of having so much cash on hand. She gave Mitchell that amount of cash and he gave her his own check for $1,000. A check for that amount was produced. On its face it bears the date of February 17, 1960, but the bank stamp on the reverse side bears the date of February 16, 1960. Payment on that check was stopped by Mitchell. He testified that he gave the stop order when he remembered belatedly about the $200 which he had advanced to Mrs. Carriell only the day before and realized that it should have been repaid to him out of the cash which she received when the Taylor check was cashed on February 17. When Mrs. Carriell protested his stopping payment, Mitchell replaced the dishonored check on February 26, 1960 with another check payable to Mrs. Carriell *317 in the amount of $900. He said she claimed a $100 credit on other matters, and thus sought to explain why the replacement check was for more than $800.
Then, after giving all this detail concerning transactions with Mrs. Carriell on the 16th and 17th, Mr. Mitchell at the next session of the court announced his desire to make a correction. He said that the mortgage papers were executed and the Taylor check was cashed on the same day, namely February 16, 1960; that he and Mrs. Carriell did everything on one day. Mitchell retracted his testimony of the circumstances surrounding the $1,000 check. He remembered this second day that Mrs. Carriell was not at all worried about carrying around so large a sum in her purse. Rather, it was at his insistence that he arranged with her beforehand that after she cashed the check she would turn over cash for his check. This was done, and Mitchell dated his check the 17th to give him time to check the records and place the mortgage on record.
Why did Mitchell, on his second day as a witness, offer this "correction" of the story which he had told with such fluency on the preceding day? I am satisfied that he realized over night that the bank stamps on the checks would not bear out what he had said about a two-day transaction. Both Mitchell checks ($200 and $1,000) and the Taylor check for $1,575 were stamped on February 16. When first on the stand Mitchell was groping for an acceptable explanation of why the payment was stopped on the $1,000 check. He needed a two-day transaction to make a pretense that he had advanced $200 to Mrs. Carriell temporarily on the 16th and then the very next day had forgotten the advance when he wrote her a check for $1,000. Even if two days had been involved, the story would be beyond belief. Mitchell would not have forgotten a $200 advance to Mrs. Carriell if one had actually been made.
Mrs. Carriell's version of these events differs substantially from that of Mitchell. She testified that she met Mitchell at Taylor's house between eight and nine o'clock in the morning, *318 as Mitchell had instructed her to do. It was at Taylor's house that Mitchell drew up the mortgage papers, and she endorsed the Taylor check. Mrs. Carriell and Mitchell thereupon drove in separate cars to the National Newark & Essex Bank in East Orange. While Mrs. Carriell parked her car, Mitchell went into the bank and came out again very quickly. Mitchell subsequently gave her his check for $1,000, she said. Mrs. Carriell's testimony was not clear at all times. She never explained the check for $200 which was endorsed by her. From the witness stand she claimed that she actually received only $900 out of the Taylor check for $1,575 which she had endorsed and Mitchell had cashed on the 16th of February. I believe the amount she received was $1,100, consisting of Mitchell's check for $900 and his check for $200. I disbelieve his story that he charged her $250 as a "fee" and was paid only that sum by her after she had cashed the Taylor check. His glib shift from a detailed account of a two-day transaction to a description of events which occurred on a single day makes me regard as unworthy of belief his testimony on any disputed points where he is not supported by exhibits or other corroboration.
I find, therefore, that Mitchell gave Mrs. Carriell two checks on February 16: the $200 check and the $1,000 check. Then he stopped payment on the latter and substituted a few days later the check for $900. I am satisfied, and find, that the proceeds of the Taylor check ($1,575) went into Mitchell's hands when the check was cashed, and out of those proceeds Mrs. Carriell got back from him a total of $1,100. The nature of the Taylor-Mitchell relationship and the characteristics of this transaction furnish reasons for suspecting that a part of the $475 difference found its way back to Taylor, but this was denied by the plaintiff and also by her son, both of whom testified that Taylor never paid Mitchell anything and was never paid anything by Mitchell. However, the mortgage in question was very much of a subordinate lien. The security was poor and Taylor was a professional money lender.
*319 Mrs. Carriell testified that on each of the several loans with Taylor which were arranged for her by Mitchell she actually received substantially less than the face amount of the mortgage. She said that Mitchell never told her anything about charging particular fees, but simply took the money out after the Taylor checks were endorsed by her and cashed by him.
Lending institutions often specify that legal services on their behalf in connection with a loan must be paid by the borrower. In substance, Taylor was requiring borrowers to pay Mitchell for legal services rendered to Taylor in connection with his lending operations. But Mitchell was a disbarred lawyer, and Taylor knew all this very well. He had had many transactions with Mitchell in which the latter functioned just as he had done in connection with the several Carriell loans from Taylor. By contrast, Taylor also had other loan transactions in which services were performed by members of the New Jersey bar.
Mitchell was practicing law without a license when he handled the details of the mortgage loan of February 16, 1960. New Jersey State Bar Association v. Northern N.J. Mortgage Associates, 32 N.J. 430 (1960). Even if I could accept his story that he charged Mrs. Carriell only a fee of $250 for services, it would still follow that the charge was unlawful because, in part at least, it was for legal work for which he could not lawfully charge anyone. Nor could Taylor, if he were alive, disclaim responsibility for the practice. He knowingly had the benefit of Mitchell's work for which Mrs. Carriell paid. He was a lender who needed legal services, and to get them relied upon a disbarred lawyer, making it a condition of the transaction that the borrower pay the "fee." It is obvious that if Mrs. Carriell had objected to paying Mitchell, or had said that she would pay no one but a duly licensed lawyer, she would not have got a loan. The Mitchell-Taylor relationship was close. Mitchell had placed approximately 100 loan applications with Taylor. This particular mortgage was only one item in a substantial flow of business in which the two men were participating.
*320 My conclusion is that Taylor and Mitchell were engaged in a conspiracy which enabled Mitchell to get financial returns out of practicing law without a license, and enabled Taylor to get benefits from that unlawful practice at the expense of Mrs. Carriell and other borrowers.
Plaintiff, Mrs. Taylor, is not a bona fide purchaser for value. Her suit to foreclose is thus subject to the same defenses as would have been available to Mrs. Carriell against Frank Taylor.
As a result of the unlawful activity of the Mitchell-Taylor combination, Mrs. Carriell received only $1,100 on what superficially appears as a loan of $1,575. To allow foreclosure for the face amount of the mortgage is unthinkable. Foreclosure for the $1,100 actually advanced, it seems to me, would still stamp with approval the illegal conduct of Mitchell and Taylor. Such a result, if reached, would mean that this duo had succeeded in acting unconscionably with no penalty other than the loss of their profit.
Foreclosure is an equitable remedy and is governed by the operation of traditional equitable principles. Spiotta v. William H. Wilson, Inc., 72 N.J. Super. 572, 579 (App. Div. 1962), certification denied 37 N.J. 229 (1962). A litigant petitioning for foreclosure must come into this court with clean hands. Atlantic Seaboard Co. v. Borough of Seaside Park, 36 N.J. Super. 142 (App. Div. 1955), certification denied 19 N.J. 619 (1955); Feldman v. Urban Commercial, Inc., 70 N.J. Super. 463 (Ch. Div. 1961), and cases listed in 30 C.J.S. Equity § 99, p. 1051, footnote 35(18) (1965).
The mortgage in this case was the product of illegality. Plaintiff, deriving her cause of action from her husband, is charged with her husband's unclean hands, and therefore all equitable relief must be denied to her. On this phase of the case, judgment will be entered against the plaintiff and it will include a provision that the mortgage of February 16, 1960 be cancelled of record.
I turn to Mrs. Carriell's cross-claim against Mitchell. The sheriff's deed of July 27, 1962, by which Mitchell obtained *321 legal title to 136 Badger Avenue and to 148 Badger Avenue, has already been mentioned. On August 9, 1962 Mrs. Carriell brought suit in the Chancery Division (Docket C-3254-61) against Mitchell, alleging that he, while she was the owner of the two properties, had collected rents from tenants and had assured Mrs. Carriell that such rents would be applied on account of his judgment; that rents in excess of the amount of the judgment had been collected, but had not been applied or otherwise accounted for. Among the demands in the complaint was one that Mitchell reconvey both properties to plaintiff. There was also a second count in the complaint alleging that Mitchell had given assurances that he would adjourn the sheriff's sale in order to give Mrs. Carriell time to procure a loan with which to pay the judgment, and that in spite of these assurances Mitchell went right ahead with sale. A third count was added by amendment, alleging that various sums were wrongfully exacted from Mrs. Carriell by Mitchell in connection with the four mortgage loans which Mitchell arranged for her with Taylor as mortgagee, thus making his indebtedness to her greater than the amount of his judgment against her.
This suit of Mrs. Carriell never came to trial but was "settled" on or about October 23, 1962. One of the terms  and the only one which really involved a potential benefit for Mrs. Carriell  was that she be given a lease for the balance of her life on the second-floor apartment at 136 Badger Avenue at a monthly rental of $25 a month. She and Mitchell signed such a lease. It is dated October 1, 1962. Mrs. Carriell also signed a general release to Philip Mitchell, dated November 6, 1962, which recites a consideration of "One dollar and other good and valuable considerations." A general release from Mitchell to her was also drafted but apparently never signed. The ribbon copy of the unsigned paper was marked as an exhibit in the trial before me.
At the time of the attempted compromise of the Carriell-Mitchell suit the property at 136 Badger Avenue was loaded down with mortgages. Giving Mrs. Carriell a lease for life on *322 one of the apartments was merely creating an illusion. After getting a legal title in July, Mitchell had done nothing about bringing the mortgages under control. He never did do anything in that direction, and I am satisfied that he never intended to. The suit to foreclose the Taylor mortgage of February 16, 1960 was started on April 25, 1963. In the foreclosure complaint the Mitchell-Carriell lease of October 1, 1962, was described as a subordinate interest to be eliminated by the foreclosure.
If Mitchell sought to settle Mrs. Carriell's suit against him by giving her a lifetime lease at a low rental, it was at least his obligation to make every reasonable effort to protect that leasehold from being cut off at a tax sale or a sheriff's sale. He ignored this obligation in such a way as to support the charge that he never intended the lease for life to last any longer than it would take to prosecute a Taylor foreclosure.
Among the defenses pleaded by Mrs. Carriell against the foreclosure claim of plaintiff is one alleging that plaintiff and Mitchell have conspired to deprive Mrs. Carriell of her interest in 136 Badger Avenue. The foreclosure complaint here describes the sheriff's sale to Mitchell, although when the complaint was filed in April 1963 the sheriff's deed of July 1962 had not been recorded. These allegations concerning a deed which a foreclosing mortgagee would not otherwise have known about suggests a considerable degree of cooperation between Mitchell and Mrs. Taylor. Also, it should be said that Mitchell throughout the trial acted like the man in charge of plaintiff's case. He gave orders to counsel of record for Mrs. Taylor about what to do and not to do in the presentation of the case. His conduct made it plain that he was present not merely to defend himself against the Carriell cross-claim, but to see to it that the foreclosure suit brought in the name of Mrs. Taylor was handled in the way he thought it should be handled. Although not the plaintiff in name, he identified himself with plaintiff's case. Any other conclusion would ignore the realities which Mitchell's conduct *323 in the court room made transparently clear. Concerning a litigant before his court the late Judge Parker of the Fourth Federal Circuit once made these comments:
"No court of equity ought to be required to listen to a man whose very presence suggests danger to the administration of justice and whose past conduct affecting the matter in litigation would cast doubt upon the ability of the court to ascertain from him the truth with respect thereto." Mas v. Coca-Cola Co., 163 F.2d 505, 511 (1947).
Though the quoted statement was made about a man who had sued to establish a patent, it is in substance applicable to Mitchell and his business dealings with Mrs. Carriell.
Mitchell had arranged three transactions between Carriell and Taylor prior to the mortgage loan involved in this suit. Mrs. Carriell testified that on one of these the face amount of the loan was $750 and Mitchell gave her $500. On another the face amount of the loan was $1,400 and Mitchell gave her $1,000. On the third the face amount of the loan was $3,800 and Mitchell gave her $3,000. The sums taken by Mitchell on these three transactions make a total of $1,450. Adding to that his toll of $475 on the mortgage in suit makes a grand total of $1,925.
When Mitchell got his judgment in the district court against Mrs. Carriell, he owed her, in an equitable sense, far more than the amount of that judgment. She moved promptly to assert her equitable position by starting her suit against him. Then came the illusory settlement and the signing of a "lease" for life, followed very promptly by the bringing of the present foreclosure suit which, if successful, would have wiped out that lease. I have already made it clear that I think Mitchell was deeply implicated in bringing and prosecuting the foreclosure suit. I do not suggest that his district court judgment can be attacked collaterally here or that his strictly legal title obtained by sheriff's deed can be directly set aside. However, his conduct has been such that a constructive trust should be imposed upon his legal title if equity is to be done.
*324 In order to do equity in this case I have concluded that a judgment should be entered which contains the following provisions:
(a) That the plaintiff's demand for foreclosure be denied and the mortgage of February 16, 1960, on which the complaint is based, be cancelled of record;
(b) That a constructive trust be impressed upon Mitchell's legal title to 136 and 148 Badger Avenue and that such trust be executed by reconveying said premises to Mrs. Carriell;
(c) That judgment be entered in favor of Mrs. Carriell and against Mitchell for the difference between (1) the total ($1,925) he illegally exacted from her, plus interest on that total, and (2) the amount of his district court judgment plus interest;
(d) That Mitchell within 20 days after the entry of the judgment shall serve upon counsel for Mrs. Carriell, and file, a written accounting of all rents collected by him from tenants of 136 Badger Avenue and 148 Badger Avenue, and disbursements made, which accounting shall be supported by appropriate vouchers for credits claimed by him; and that Mrs. Carriell shall have 10 days following the service of such accounting to take exception thereto if she so desires.