163 N.J. Super. 315 (1978)
394 A.2d 899
ASSOCIATED EAST MORTGAGE CO., A NEW JERSEY CORPORATION, PLAINTIFF,
v.
WILLIAM G. YOUNG AND DIANNE M. YOUNG, HIS WIFE; PAUL AUERBACH AND MRS. PAUL AUERBACH, WIFE OF PAUL AUERBACH, SAID NAME OF MRS. PAUL AUERBACH BEING FICTITIOUS: MEADOWLANDS NATIONAL BANK; STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided October 24, 1978.
*316 Mr. Alvin D. Miller appeared on behalf of plaintiff.
Mr. Gregory G. Diebold appeared on behalf of defendants William G. Young and Dianne M. Young (Mr. Timothy K. Madden, Director Hudson County Legal Services Corp.).
Mr. Paul J. Modarelli appeared on behalf of defendant Meadowlands National Bank (Messrs. Platoff, Heftler, Harker & Nashel, attorneys).
*317 KENTZ, J.S.C.
This is a foreclosure action involving a residential mortgage insured by the Department of Housing and Urban Development (HUD) under a program designed to aid low-income families in purchasing their own homes. National Housing Act § 221(d)(2), as amended 12 U.S.C.A. § 1715l(d)(2) (1969) (HUD program). Plaintiff Associated East Mortgage Co. (Associated) is a New Jersey corporation engaged in the mortgage lending business. Defendants William G. and Dianne M. Young (Youngs) are the mortgagors, and defendant Meadowlands National Bank (Meadowlands) is the holder of a second mortgage on the Youngs' property. A voluntary dismissal was entered as to defendants Paul Auerbach and Mrs. Paul Auerbach, the tenants who occupied an apartment in the mortgaged premises. The State of New Jersey was also named a defendant as the possible holder of a judgment lien against defendant William Young resulting from an action brought by the Office of the Public Defender for legal services. A default was entered against the State.
Plaintiff seeks a judgment of foreclosure of the mortgage contract. Associated regards this mortgage as no different from those which are not insured by HUD and claims it has followed the standard banking procedures for handling defaults. Although HUD has published an extensive and detailed handbook, Associated contends it is not legally bound to follow these recommended procedures because they are merely guidelines for private mortgagees. The Youngs filed a counterclaim seeking a declaratory judgment determining that plaintiff is legally bound to provide them with forbearance relief. Youngs also seek an injunction compelling not only forbearance but also a recasting of their mortgage. They assert that while Associated is reaping the benefits of a mortgage totally guaranteed by HUD, it is disregarding those features which distinguish it from a traditional mortgage. The Youngs argue that plaintiff has failed to fulfill its obligations under the HUD program and thus enters the court with unclean hands. The duties *318 and obligations of a private mortgagee in servicing mortgages insured under the HUD program must be determined in deciding this controversy.
After considering the evidence presented, the court finds the following facts. On June 1, 1972 the Youngs gave a mortgage to Associated for $17,200 to purchase a home in Jersey City. The mortgage provided for monthly payments of $236 and was approved pursuant to the HUD program. Mr. Young, a 37-year-old bus driver with a wife and four children, had a gross annual income of approximately $14,500. In March 1976 a strike forced his unemployment and his income was reduced to $50 a week in union strike benefits. Despite this obvious financial setback, the Youngs continued to pay their mortgage with funds from their savings account from March to August 1976, when the account was depleted. An apartment in the Youngs' home had been rented for $185 a month until it became vacant in June 1976. Subsequent efforts to relet the apartment were unsuccessful.
The Youngs contacted Associated as soon as the strike occurred to request a reduction in the monthly payments. Associated denied this request and in July 1976 sent a form letter to the Youngs as a reminder of overdue payments for June and July. This letter warned that foreclosure was imminent if these payments were not made. During the four years prior to June 1976 the Youngs had regularly paid the monthly mortgage installments.
These form letters continued from July through October 1976, during which time the Youngs executed and delivered a promissory note to Meadowlands for $6,791.40 at 7% annual interest with monthly payments of $80.85, and also gave a second mortgage as security for the note. They have been making irregular partial payments of $20 to Meadowlands on account of this indebtedness and these payments have been accepted although the note is in default.
*319 During the period of her husband's unemployment Mrs. Young frequently telephoned plaintiff to request a reduction in the mortgage payments and to explain her family's financial circumstances, but these requests received little attention. At the Youngs' urging, Associated finally consented to a forbearance agreement which called for monthly payments of $315 (regular payments of $236 plus $79 in arrears) to be effective from October 1, 1976 to June 1, 1977, at which time the mortgage would be current. Although they never signed this agreement, the Youngs attempted to meet its payment schedule and offered one payment of $315 which was accepted. However, they were unable to make additional payments of this increased amount. Thereafter, the Youngs did not hear from Associated regarding the possibility of reduced or suspended payments pending Mr. Young's return to work.
Associated instituted this foreclosure action on April 6, 1977. In May 1977 the strike ended and Young returned to work. He was then able to resume paying his regular monthly mortgage installments of $236, which have been placed in escrow pending the outcome of this action.
The American dream of every family owning its own home was aided by congressional mandate in the Housing Act of 1949, § 2, as amended 42 U.S.C.A. § 1441 (1978), to provide everyone with a decent home and a suitable living environment as soon as feasible. The program under which the Youngs secured their mortgage was conceived with this objective in mind. According to the provisions of the Housing Act of 1949, a mortgagee who is approved by the Secretary of HUD (Secretary) as qualified to service the mortgage properly, could foreclose in case of default, take possession of the property and receive the insurance benefits to which it is entitled. 12 U.S.C.A. §§ 1709 (b)(1), 1710(a)(1). The mortgagee's obligation to pay the insurance premium charges would be released after conveying title to the Secretary and assigning to him all its claims against the mortgagor or others arising out of the mortgage *320 agreement or foreclosure proceedings. The Secretary would then issue debentures to the mortgagee with a total face value equal to the amount of the mortgage and a certificate of claim subject to a cash adjustment as provided in the statute. 12 U.S.C.A. § 1709(a)(1). Thus, the mortgagee has an incentive to participate in the HUD program since the mortgages are risk-free and totally guaranteed by the Federal Government.
Pursuant to the authorization in 12 U.S.C.A. § 1715b, HUD promulgated a series of regulations to govern the proper servicing of these mortgages. The regulations were codified in the Code of Federal Regulations (C.F.R.). See 24 C.F.R. §§ 203.600 et seq. (1977). Therefore, the regulations have the effect of law and are to be used as authority by the agency which issued them. 44 U.S.C.A. § 1510(a) (1969). Accord, Sheridan-Wyoming Coal Co. v. Krug, 84 U.S. App. D.C. 288, 293, 172 F.2d 282, 287 (D.C. Cir.1949), rev'd on other grounds 338 U.S. 621, 70 S.Ct. 392, 94 L.Ed. 393 (1950); Northern States Power Co. v. Rural Electrification Administration, 248 F. Supp. 616, 622 (D. Minn. 1965); U.S. v. Springfield Fire & Marine Ins. Co., 107 F. Supp. 753, 756 (W.D. Mo. 1952), aff'd 207 F.2d 935 (8 Cir.1953).
The documents codified in the C.F.R. are prima facie evidence of the original text of the regulations and are required to be judicially noticed. 44 U.S.C.A. §§ 1507, 1510(e); Wei v. Robinson, 246 F.2d 739, 743 (7 Cir.1957), cert. den. 355 U.S. 879, 78 S.Ct. 144, 2 L.Ed.2d 109 (1957); U.S. v. Millsap, 208 F. Supp. 511, 516 (D. Wyo. 1962); Sims v. So. Bell Tel. & Tel. Co., 111 Ga. App. 363, 141 S.E.2d 788, 789 (App. Ct. 1965). Federal laws and regulations are binding on state courts and are subject to their judicial notice. Lange v. Nelson-Ryan Flight Serv., Inc., 259 Minn. 460, 465, 108 N.W. 2d 428, 432 (Sup. Ct. 1961); Ralston v. Hawes, 334 Mass. 51, 53, 133 N.E.2d 589, 591 (Sup. Jud. Ct. 1956).
*321 In order to fully appreciate the issues here a thorough review of the pertinent regulations in the C.F.R. is necessary. These regulations require a HUD-approved mortgagee to employ or contract for the employment of trained personnel who are competent in all aspects of mortgage-lending activities, including servicing and field-collection activities. They also mandate that these mortgagees employ adequate staff and facilities to originate and service mortgages in accordance with the C.F.R. 24 C.F.R. § 203.9. The collection techniques for mortgages which are in default must be adapted to the mortgagor in each case. A mortgagor's individual circumstances must be considered, although mortgagees are urged to take prompt action to collect the amounts due on the mortgages. 24 C.F.R. § 203.600. A prerequisite to foreclosure is the mortgagee's obligation to arrange a face-to-face interview with the mortgagor or at least to make a reasonable attempt to schedule such a meeting. This must occur "before three full monthly installments due on the mortgage are unpaid." 24 C.F.R. § 203.604(b). In case of default on a repayment plan not arranged at a personal interview, the mortgagee must schedule a face-to-face meeting within 30 days of the default before initiating a foreclosure action. Id. A reasonable attempt by the mortgagee to arrange such a meeting is considered to consist of at least one letter sent by certified mail to the mortgagor in addition to at least one trip to visit him at the mortgaged property unless it is located more than 200 miles from the mortgagee, its servicer or a branch office of either. 24 C.F.R. § 203.604(d). Face-to-face meetings are not required if (1) the mortgagor does not reside at the mortgaged property; (2) the property is not within 200 miles of the mortgagee, its servicer, or a branch office of either; (3) the mortgagor has clearly indicated he will not cooperate with the interview; (4) the repayment plan is consistent with the mortgagor's circumstances, was entered into to bring the account up-to-date and the *322 payments are current, or (5) a reasonable effort to arrange an interview is unsuccessful. 24 C.F.R. § 203.604(c).
The mortgagee must conduct a review of the mortgagor's file and of the servicing procedures used in order to be satisfied that they were in accordance with the requirements set forth in the regulations. This review must precede any foreclosure action by the mortgagee. 24 C.F.R. § 203.606(a).
Special forbearance relief may be approved by the Secretary under certain conditions. 24 C.F.R. § 203.614(a). Moreover, a mortgagee may grant special forbearance relief without the Secretary's approval if the mortgagor establishes to the mortgagee's satisfaction that the default was due to circumstances beyond his control. 24 C.F.R. § 203.614(b) (1)(ii). If a written forbearance agreement is executed, it should provide for the suspension or reduction of payments for a period not to exceed 18 months. Regular mortgage payments should be resumed after the forbearance period expires and the total amount accruing prior to and during the forbearance period should be repaid. A period no longer than the forbearance period may be added to the mortgage term to allow for the repayment. 24 C.F.R. § 203.614 (b)(2)(iii).
Another avenue is available to the mortgagee in lieu of instituting a foreclosure action. The Secretary will accept assignment of HUD-insured mortgages to avoid foreclosure if (1) the mortgagor has been informed by the mortgagee of its intention to foreclose; (2) at least three monthly installments are due and unpaid; (3) the property is the mortgagor's principal place of residence and the mortgagor does not own other property subject to a mortgage insured or held by the Secretary; (4) the default has been caused by circumstances out of the mortgagor's control and he is unable to correct the delinquency within a reasonable time or make full mortgage payments, and (5) a reasonable likelihood exists that resumption of full payments will begin *323 after a temporary period of reduced or suspended payments not to exceed 36 months and the mortgage can be paid in full even if the maturity date must be extended. 24 C.F.R. § 203.650(a). The mortgagee may determine that these conditions apply to the subject mortgage and may then request the Secretary to accept an assignment of the mortgage. 24 C.F.R. § 203.652(a). If the mortgagee believes that all the above conditions have not been met, it should advise the mortgagor that he may then make a request to the Secretary to accept an assignment. 24 C.F.R. § 203.652(b). The mortgagor must be notified of the mortgagee's determination on a form approved by the Secretary. 24 C.F.R. § 203.654(c).
There is a discussion in 24 C.F.R. § 203.616(a) concerning the possibility of a mortgage being recast provided that the Secretary determines that the default was due to circumstances beyond the mortgagor's control and a special forbearance agreement was executed. See also, 24 C.F.R. § 203.614(a). The recasting is accomplished by reamortizing the total amount due over the remaining term of the mortgage or over such a longer period of time as determined by the Secretary, if his approval is necessary. If prior approval is not required, the term may be extended for a period not more than ten years beyond the original maturity date. 24 C.F.R. § 203.616(b).
HUD has issued a handbook to provide lenders with the information necessary to service HUD-insured home mortgages. See U.S. Dep't of Housing and Urban Development, Handbook No. 4191.1, Administration of Insured Home Mortgages (1974) (Handbook). The Handbook elaborates upon the regulations published in the Federal Register and codified in the C.F.R. It discusses in detail the procedural standards to be observed by the servicers of HUD mortgages. It is to be used by HUD-approved mortgagees in conjunction with two other HUD handbooks concerning the home mortgage insurance programs. Handbook, supra at i. These *324 handbooks include information concerning how to apply for HUD mortgages and the requirements and procedures as well as the instructions for completing and submitting forms and reports for fiscal record-keeping of insured mortgages.
An examination of the pertinent sections of the Handbook is appropriate here. The introduction to the Handbook discusses the monitoring of servicing operations by the central and field offices of HUD in accordance with its management objectives. See id., par. 1. HUD's approval may be suspended or terminated if a mortgagee has been using poor servicing techniques and, upon notice to revise them, has not satisfactorily corrected these deficiencies. Id.
One of HUD's servicing objectives is to minimize the possibility of foreclosure. Id., par. 2(b). Foreseeable problems such as irregular employment, low income, large families and a general lack of experience in financial management are to be effectively handled with servicing techniques which take into account the individual characteristics and circumstances of a mortgagor. Id., par. 7. This section of the Handbook parallels 24 C.F.R. § 203.600 which requires that collection techniques be adapted to individual differences in mortgagors and to their particular circumstances.
The Handbook recommends forbearance as a possible alternative to foreclosure in cases of a deficiency or default on the part of a temporarily unemployed mortgagor. Handbook, supra, par. 103(c). The collection staff should be aware "of HUD approved counseling agencies and other community organizations which can provide services to the mortgagor, treat the causes of the default, and help the mortgagor become current." Id., par. 106(d). Letters, automatic notices, telephone calls and personal interviews are listed as methods available to deal with delinquent borrowers. Id., par. 107 (a)-(c). However, if form letters are used, letters of the same form should not be sent to a mortgagor more than once in connection with the same default. Id., par. 107(a). Although the Handbook recommends that a personal interview be held with the defaulting mortgagor no later than the second *325 month of the delinquency, id., par. 107(c), the C.F.R. goes further by requiring face-to-face interviews before three full monthly payments become due and unpaid. 24 C.F.R. § 203.604(b).
Before a foreclosure action is instituted the Handbook calls for a systematic review to "insure that collection policies set forth in [the] Handbook have been followed." Handbook, supra, par. 110(a). If these procedures have not been followed, the case should be returned to the servicing personnel for further attention. Id., par. 110(b). A comparable requirement is contained in 24 C.F.R. § 203.606, which mandates a pre-foreclosure review to assure that approved practices have been followed.
The Handbook, supra, par. 121 provides that "[m]ortgagees are expected to make a concerted effort to avoid the foreclosure or assignment of HUD insured mortgages, and to utilize acceptable methods of forbearance relief, wherever feasible." Forebearance is available in several forms where it is reasonable for the mortgagee to believe that the mortgagor can and will resume the mortgage payments. Id. A mortgagee is given time to delay instituting foreclosure for as long as one year from the date of default. Id., par. 122(a). Reduced or suspended payments are acceptable during this one year period. Id. A default occurs 30 days from the mortgagor's failure to make an installment payment. Id.
The Handbook and the C.F.R. both recommend that forbearance relief be granted if the default is due to circumstances beyond the mortgagor's control. Compare 24 C.F.R. § 203.614 with Handbook, supra, par. 123(a). The Handbook also allows relief by recasting mortgages in default or by assignment of defaulted mortgages to HUD. Id., pars. 125, 126, which parallel 24 C.F.R. § 203.616 and 24 C.F.R. § 203.650.
The legal effect of the Handbook or its predecessor, U.S. Dep't of Housing and Urban Development, FHA Guidebook No. 4015.9 (1970) (Guidebook) has been discussed in several recent decisions concerning HUD-assisted mortgages. *326 Brown v. Lynn (Brown II), 392 F. Supp. 559 (N.D. Ill. 1975); Brown v. Lynn (Brown I), 385 F. Supp. 986 (N.D. Ill. 1974). Brown I was an action brought by mortgagors under HUD-assisted and HUD-insured mortgage programs against mortgagees who had begun foreclosure actions against them. 385 F. Supp. at 988. Plaintiffs alleged, among other things, that the mortgagees violated the servicing requirements of the Guidebook, which they contended was legally binding upon the mortgagees. Id. at 990. HUD, as a defendant, was charged with violation of plaintiffs' statutory rights under the National Housing Act. Id. at 988. On defendants' motion to dismiss the complaint the court determined that the Guidebook provisions were merely "statements of policy and not regulations, per se, having the force and effect of law" and thus had no binding effect on the mortgagees. Id. at 998; accord, Nesmith v. Lynn, 377 A.2d 352, 353 (Del. Sup. Ct. 1977). This determination was based on the legal principle that regulations of HUD which are not published in the Federal Register do not have the same force of law as duly promulgated regulations. Brown I, supra, 385 F. Supp. at 998; accord, Estrada v. Hills, 401 F. Supp. 429, 437 (N.D. Ill. 1975). Accordingly, the claim against the mortgagees based upon alleged violations of the Guidebook was dismissed. Brown I, supra, 385 F. Supp. at 1001. However, the court did find that a valid claim existed against HUD since "HUD ha[d] failed to fulfill its obligation to low-income homeowners" by treating them no differently from conventional mortgagors. Id. at 999-1000.
On a motion to reconsider its decision in Brown I as to the mortgagees, the court held in Brown II that the Guidebook and its successor, the Handbook, having not been published in the Federal Register contrary to HUD's own regulations in 24 C.F.R. § 10.5 and the regulations under the Administrative Procedure Act, 5 U.S.C.A. §§ 552(a)(1) (D), 553(b) (1977), were not legally binding and not enforceable in an action for monetary damages and injunctive *327 reilef.[1]Brown II, supra, 392 F. Supp. at 561-562. However, it is significant to note that although the court in Brown II denied the plaintiff's motion for reconsideration, it discussed alternative remedies for mortgagors who raise the defense of noncompliance with the Handbook in foreclosure actions and the possibility of HUD mortgagees being precluded from disregarding the servicing and forbearance provisions of the Handbook by courts of equity. Brown II, supra, 392 F. Supp. at 563.
As I have indicated earlier, the C.F.R. has the effect of statute or law, unlike the Handbook which has been held to be merely advisory. The HUD-promulgated C.F.R. regulations were necessary to fulfill HUD's obligations under the National Housing Act. 12 U.S.C.A. § 1715b; see 515 Associates v. Newark, 424 F. Supp. 984, 991 (D.N.J. 1977) (legally binding regulations in the C.F.R. are necessary to carry out the provisions of the National Housing Act), U.S. v. Am. Nat'l Bank & Trust Co., 443 F. Supp. 167, 175 (N.D. Ill. 1977) (in a foreclosure action, court denied summary judgment for government after recognizing HUD's disregard of its own regulations in the C.F.R. which expressly authorize alternatives to foreclosure, as well as HUD's responsibilities under the National Housing Act). These regulations pertaining to servicing HUD-insured mortgages and handling delinquencies and defaults are legally binding on HUD-approved mortgagees. 24 C.F.R. §§ 203.600 et seq. See, e.g., 44 U.S.C.A. § 1505; Sheridan-Wyoming Coal Co. v. Krug, supra, 84 U.S. App. D.C. at 293, 172 F.2d at 287.
*328 Many of the Handbook provisions also appear in the C.F.R. Since the C.F.R. is legally binding, these provisions that are contained in the C.F.R. have the same binding effect. See Housing Auth. of Passaic v. Torres, 143 N.J. Super. 231, 235 (App. Div. 1976) (held that a HUD-issued circular was a mandatory regulation with the same binding effect as the manual into which it would be physically incorporated); see also Thorpe v. Housing Auth. of Durham, 393 U.S. 268, 275, 89 S.Ct. 518, 522-523, 21 L.Ed.2d 474, 480 (1969). These sections that are both in the C.F.R. and the Handbook provide the necessary assurance that HUD-insured mortgages will be given special attention rather than be treated as conventional mortgages.
A review of the facts here clearly discloses that many of the servicing procedures in the C.F.R. for HUD mortgages in default were not followed by Associated. No face-to-face interview was scheduled or even attempted to be scheduled by plaintiff before three monthly payments became due and unpaid as required in 24 C.F.R. § 203.604(b). The meeting which resulted in the proposed unrealistic forbearance agreement was arranged as a result of repeated efforts by the Youngs to explain their financial circumstances and to try to work out an arrangement to avoid foreclosure. The forbearance agreement provided for monthly payments larger than the regular payments which the Youngs could not possibly meet. A period of only nine months' forbearance was proposed although Associated could have offered a forbearance agreement for the suspension or reduction of payments for a period up to 18 months as allowed by 24 C.F.R. § 203.614(b)(2)(i).
Without mandatory regulations to enforce the HUD program, mortgagees granting HUD-insured mortgages to low-income families could service them no differently than conventional mortgages. Binding regulations are intended to prevent mortgagees from instituting foreclosure actions immediately upon default. Associated's conduct here was clearly inconsistent with the spirit and intent of the regulations. *329 Such conduct undermines "the avowed purpose of the federally-insured mortgage * * * to provide a decent home * * * for every American family * * * by permitting mortgagees to accept limited down payments, reduced interest rates, and longer maturity dates." 42 U.S.C.A. § 1441, 12 U.S.C.A. § 1709(b)(3), (5), (9). See Gov't Nat'l Mtg. Ass'n v. Screen, 85 Misc.2d 86, 379 N.Y.S.2d 327, 329 (Sup. Ct. 1976). Because of these unique benefits HUD-insured mortgages require special servicing.
Families who receive HUD-insured mortgages do not meet the standards required for conventional mortgages. It would be senseless to create a program to aid families for whom homeownership would otherwise be impossible without promulgating mandatory regulations for HUD-approved mortgagees to insure that objectives of the HUD program are met. Foreseeable obstacles to these families' maintaining regular payments, such as temporary illness, unemployment or poor financial management, should be handled with a combination of understanding and efficiency by mortgagees or servicers. Poor servicing techniques such as computerized form letters and unrealistic forbearance agreements as were used by Associated defeat the purpose of the National Housing Act and the HUD program. The prevention of foreclosure in HUD mortgages wherever possible is essential. The HUD programs, objectives cannot be attained if HUD's involvement begins and ends with the purchase of the home and the receipt of a mortgage by a low-income family. See Brown I, supra, 385 F. Supp. at 999-1000 ("HUD has tragically misled thousands of low-income Americans [by adopting] a policy and program * * * which would enable them to acquire a home notwithstanding their marginal financial circumstances * * * [as a result of this] HUD has now become the largest owner of abandoned dwellings in our urban-communities."); Fed'l Nat'l Mtg. Ass'n v. Ricks, 83 Misc.2d 814, 823, 372 N.Y.S.2d 485, 495 (Sup. Ct. 1975) ("precipitous foreclosures are inimical to *330 the very objectives and purposes of the National Housing Act and should not be condoned by the Court").
Brown II left the door open for a court of equity to give relief to a mortgagor of a HUD-insured loan:
* * * [m]erely rubber-stamping mortgagees' foreclosure actions, when they have acted barely within the formal legal bounds of these loosely defined housing programs, will contribute further to the needless loss of homes and to the creation of virtual ghost areas within our inner cities. Foreclosure courts need not woodenly perpetuate the national tragedy surrounding quick foreclosures ... but ... should require adherence to the policies and procedures prescribed by the Handbook. [392 F. Supp. at 563]
Furthermore, equitable principles of fair play also support the desire of a court of equity to give relief to a mortgagor under the circumstances presented here. These principles govern the remedy of foreclosure. New Jersey Bank v. Azco Realty Co., 148 N.J. Super. 159, 166 (App. Div. 1977); Taylor v. Mitchell, 90 N.J. Super. 312, 320 (Ch. Div. 1966). The doctrine of unclean hands is also recognized in foreclosure actions. New Jersey Bank v. Azco Realty Co., supra, 148 N.J. Super. at 166; Totowa S. & L. Ass'n v. Crescione, 144 N.J. Super. 347, 352 (App. Div. 1976); Leisure Technology Northeast, Inc. v. Klingbeil Holding Co., 137 N.J. Super. 353, 356 (App. Div. 1975); Taylor v. Mitchell, supra, 90 N.J. Super. at 320; Spiotta v. Wm. H. Wilson, Inc., 72 N.J. Super. 572, 579 (App. Div. 1962). The unclean hands doctrine refuses relief to a plaintiff whose conduct has violated the court's conscience, good will or other equitable principles. 2 Pomeroy, Equity Jurisprudence (5 ed. 1941), § 398 at 93. Moreover, equity will not consciously become the instrument of injustice. Brower v. Glen Wild Lake Co., 86 N.J. Super. 341, 350 (App. Div. 1965).
Associated did not follow the specific directives in Handbook. Its failure to do so defeats the purpose of the Handbook and constitutes unconscionable conduct. Accord, Fed'l Nat'l Mtg. Ass'n v. Ricks, supra, 83 Misc.2d 823, 372 N.Y.S.2d *331 at 496. Plaintiff was an "imprudent and callous lender" in servicing defendants' mortgage and should not now have the aid of equity. Gov't Nat'l Mtg. Ass'n v. Screen, supra, 85 Misc.2d 86, 379 N.Y.S.2d at 332. Furthermore, since Associated did not comply with the legally binding provisions in the C.F.R. and their counterparts in the Handbook in servicing the Youngs' mortgage, I find that Associated has entered this court with unclean hands and is not entitled to the relief sought.
The proceeds of the escrow account into which the Youngs have been paying their mortgage installments shall be turned over to plaintiff and credited on the indebtedness. If thereafter any delinquency continues on the first mortgage, Associated and the Youngs shall endeavor to establish a mutually agreeable plan to restore the account to a current status in accordance with the applicable provisions of the C.F.R. and the Handbook. Failing to reach such an agreement, either party may apply to this court on notice for such further relief as may be appropriate and necessary to implement the judgment about to be entered.
The mortgage lien of Meadowlands will remain subordinate to the first mortgage held by Associated. If the mortgage of Associated is recast, it will continue as a first lien and the second mortgage will not thereby be affected. 24 C.F.R. § 203.616.
The complaint is dismissed and judgment is entered on the counterclaim in accordance herewith.
NOTES
[1] Effective August 11, 1976 the publication of HUD handbooks in the Federal Register was suspended. However, any regulatory provisions contained in the handbook's might be "promulgated separately by rule." 41 Fed. Reg. 33,909 (1976). Therefore, the publication of handbooks in the Federal Register is no longer at the Secretary's discretion.